## JERSEY CENTRAL POWER & LIGHT CO. *v.* FEDERAL POWER COMMISSION.*

No. 299.   Argued January 4, 5, 1943.   Reargued March 4, 5, 1943.—
Decided May 3, 1943.

*Together with No. 329, *New Jersey Power & Light Co.* v. *Federal Power Commission,* also on writ of certiorari, 317 U. S. 610, to the Circuit Court of Appeals for the Third Circuit.

*Mr. John W. MacDonald* for petitioner in No. 299, and *Messrs. Frederic P. Glick* and *Allen E. Throop* for petitioner in No. 329. *Mr. Reynier J. Wortendyke, Jr.* was with them on a joint brief.

*Assistant Attorney General Shea* argued the cause on the reargument and *Mr. Lester P. Schoene* on the original argument, and *Solicitor General Fahy* and *Messrs. Paul A. Sweeney, Charles V. Shannon, Lambert McAllister,* and *Howard E. Wahrenbrock* were with them on the brief, for respondent.

*Mr. Frank H. Sommer* filed a brief on behalf of the State of New Jersey, as *amicus curiae,* urging reversal.

MR. JUSTICE REED delivered the opinion of the Court.

These two cases bring here for review the construction of §§ 201 and 203 (a) of the Federal Power Act, as amended by the Public Utility Act of 1935.[1] These sections are included in Title II, Part II, of the latter act, which Part relates to federal regulation of the business of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale. By these sections, the public utilities subject to the Federal Power Commission are defined and the acquisition of securities of such utilities by any other utility subject to the act is forbidden without authorization of the Commission.

I. After the enactment of the above amendments to the Federal Power Act, and without seeking Commission authorization, the New Jersey Power & Light Company purchased from others than the issuer certain securities of the Jersey Central Power & Light Company. The Fed-

---

[1] 49 Stat. 803, 847, 849, 16 U. S. C. §§ 824, 824 (b).

eral Power Commission, being of the opinion that both the purchaser and the issuer were public utilities within the definition of the Federal Power Act and that therefore the acquisition of the stock was illegal, on June 7, 1938, entered an order that the purchaser submit information concerning the acquisition of the stock and show cause why the Commission should not proceed to enforce the requirements of the act. To this order, the purchaser answered that the Jersey Central was not a public utility within the definition of the act and that the approval by the Federal Power Commission to the acquisition was therefore not required by law. By permission of the Commission, the Jersey Central intervened and made the same contention as to its status. Thus there were presented for determination two questions: first, whether Jersey Central was a public utility under the act; and second, whether if it was a public utility, this acquisition of its stock was permissible in view of the declaration of § 201 (a) that federal regulation should "extend only to those matters which are not subject to regulation by the States." This purchase is subject to regulation by New Jersey.

It is admitted that the purchaser, Jersey Power, is a public utility under the act. The Commission after investigation and hearing held that Jersey Central also was a public utility under the act. 30 P. U. R. (N. S.) 33. This holding was based on findings that Jersey Central owns and operates transmission facilities (an electric line) extending from its substation adjacent to its generating plant in South Amboy, New Jersey, to the south bank of the Raritan River in the same state where the line joins the transmission facilities of another company, not here involved, the Public Service Electric & Gas Company. This latter company transmits the energy from the point of junction on the Raritan to a common bus

bar [2] in one of its substations, located also in New Jersey at Mechanic Street, Perth Amboy. From the bus bar, Public Service has transmission facilities extending to the mid-channel of Kill van Kull, a body of water between New Jersey and Staten Island, New York. At mid-channel, Staten Island Edison Corporation, another utility, connects with its transmission facilities which extend to its own Atlantic substation on Staten Island. The Commission further found, in the words quoted below, that energy generated in New Jersey by Jersey Central was consumed in New York and energy generated in New York was consumed in New Jersey.[3]

The evidence upon which these findings were based showed that the energy was delivered from Jersey Central

---

[2] A bus conductor, or group of conductors, is a switchgear assembly which serves as a common connection for three or more circuits, *American Standard Definitions of Electric Terms,* published by American Institute of Electrical Engineers, p. 97.

[3] 30 P. U. R. (N. S.) 33, 36: "that the transmission facilities described provide a direct and interconnected line for the flow of electric energy between the substation of Jersey Central Power & Light Company located adjacent to its generating plant in South Amboy and Atlantic substation of Staten Island Edison Corporation on Staten Island in the state of New York, via Mechanic street substation, and electric energy was transmitted over such transmission facilities between such points via Mechanic street substation on numerous occasions during certain days and almost daily throughout 1936, 1937, and to September, 1938; that there is no evidence or testimony of any change in such operations during this period or subsequent thereto; that electric energy transmitted over facilities extending from the substation adjacent to the generating plant of Jersey Central Power & Light Company in South Amboy, New Jersey to Atlantic substation, on Staten Island, in the state of New York, via Mechanic street substation, is generated in the state of New Jersey and consumed in the state of New York; that electric energy transmitted from Atlantic Street substation to the substation of Jersey Central Power & Light Company in South Amboy, New Jersey, via Mechanic street substation, is generated in the state of New York and consumed in the state of New Jersey; . . ."

to and from Public Service under contract and that Public Service likewise delivered and received energy under contract to and from Staten Island Edison. Jersey Central had no control over the destination of its energy after it made delivery to Public Service at the Raritan but it did, of course, control the distribution of energy received from Public Service. The deliveries from Jersey Central to Public Service were substantial, above fifty-five million kilowatt hours in each year of the period 1934 to 1937, inclusive. Those from Public Service to Staten Island were smaller for the same period, amounting to three to four million k. w. h. annually and the flow from Staten Island to Public Service aggregated about the same amount. Although, as will appear hereafter, the evidence shows some Jersey Central energy is consumed in New York, the amount is unknown.

The connection between Public Service and Staten Island is maintained primarily to guard the Staten Island distribution against breakdown. It is used for emergencies a few times per year on an average. Surplus energy is occasionally sold. The rest of the time the line is maintained "in balance." This is to avoid a delay of transmission in an emergency. If the connection were not maintained, an appreciable time would be lost in communicating and reëstablishing the connection. Any oscillation of the balance, created by increased demand in New York or New Jersey, carries energy in one direction or in another to be consumed on one side or the other of the line between the states. This is called "slop-over" energy. These bulk deliveries were the subject of the sale agreements between Public Service and Staten Island.

Since the bus bar into which the Jersey Central energy is fed also receives large amounts of energy from other sources, the facts heretofore detailed do not prove conclusively that energy generated by Jersey Central passes to and is consumed in New York. This further evidence

appears from testimony presented by investigators of the Commission. Their examination of Public Service records discloses that there were moments of time between January 26, 1937, and September 6, 1938, when all the energy flowing into the bus bar at Mechanic Street came from Jersey Central and at the same moments energy flowed from Mechanic Street in New Jersey to the Atlantic substation in New York. As no pools of energy exist from which the flow to New York could have been drawn, it necessarily follows that Jersey Central production was instantaneously transmitted to New York. Cf. *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165. The amount of energy transmitted was small. The evidence was developed from 184 log readings selected from 25,000. Of the 184 log readings, 12 showed this flow of energy from Jersey Central to New York between August 26, 1935, the effective date of the Federal Power Act, and March 14, 1938, the date of the present purchase of stock.[4] Twelve showed such flow shortly after the purchase.

---

[4] There is dispute as to whether the 184 instances selected for examination were typical. In view of the evidence just detailed as to the service arrangements between Jersey Central and Public Service, and Public Service and Staten Island Edison, this seems of no importance. There is no contention that the energy actually transmitted interstate shall be treated as accidental or that it falls under the *de minimis* rule. The method of selection is explained as follows:

"Q. . . . Then you have taken some 150* readings out of approximately 25,000 readings. Just why did you take these particular 150, Mr. Grimsley? A. At times when considerable power was going over from Jersey Central and for the same period it was going to Staten Island. That was necessary to make my determination. Now we might get 15,000, I don't know, to compare with those, but the point was to establish certain conditions at time of flow and at times when there was no energy flowing to Staten Island there was no point in taking those readings.

"Q. These are hand-picked readings where you worked toward a particular result and you selected those that would best show what you desired to establish? A. I was trying to get a condition when the

This evidence, we think, furnishes substantial basis [5] for the conclusion of the Commission that facilities of Jersey Central are utilized for the transmission of electric energy across state lines.

Petitions for rehearing were denied. An appeal was taken to the Circuit Court of Appeals under the provisions of § 313 of the act.[6] The determination of the Commission was affirmed, 129 F. 2d 183, and in view of the important questions of federal law raised by the petitions for certiorari, we granted review. 317 U. S. 610.

The primary purpose of Title II, Part II, of the 1935 amendments to the Federal Power Act, *supra* note 1, was to give a federal agency power to regulate the sale of electric energy across state lines. Regulation of such sales had been denied to the states by *Public Utilities*

---

energy was coming over from Jersey Central and flowing to Staten Island and over a period that might be considered typical.

"Q. Just a moment—A. (interposing) I don't know unless we go through all of them and compare them with these.

"Q. I suppose it would be pretty easy to pick out 150 other examples when power is flowing from Metuchen substation to Staten Island supplying the Mechanic Street load, would it not? A. Oh, I think so, yes. Maybe more."

*The Commission's witness Grimsley spoke of 150 instances, but actual count discloses 184.

[5] "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." § 313 (b), 49 Stat. 860, 16 U. S. C. § 825*l* (b).

[6] The order entered determined that Jersey Central Power & Light Company is a public utility and that the acquisition of its stock by New Jersey Power & Light Company was a violation of § 203 (a) of the Federal Power Act. 30 P. U. R. (N. S.) 33, 36. This order fixed the status of Jersey Central as a utility amenable to the provisions of the Act: e. g., rates, § 205 (a); ascertainment of cost of property, § 209 (a); accounts, § 201. *Rochester Telephone Corp.* v. *United States*, 307 U. S. 125; *Federal Power Commission* v. *Pacific Co.*, 307 U. S. 156; *Columbia Broadcasting System* v. *United States*, 316 U. S. 407.

*Commission* v. *Attleboro Steam Co.*, 273 U. S. 83. On account of the development of interstate sales of electric energy, it was deemed desirable by Congress to enter this field of regulation.[7]

II. Petitioners concede that some energy generated by Jersey Central and sold and delivered by it to Public Service passes thereafter to New York. Their contention is that the arrangements by which this energy passes to New York does not make Jersey Central a public utility,

---

[7] S. Rep. No. 621, 74th Cong., 1st Sess., p. 17:

"In recent years the growth of giant holding companies has been paralleled by the rapid development of the electric industry along lines that transcend State boundaries. To a great extent through the agency of the holding company, local operating units have been tied together into vast interstate systems. As a result the proportion of electric energy that crosses State lines has steadily increased. While in 1928, 10.7 percent of the power generated in the United States was transmitted across State lines, the percentage had increased by 1933 to 17.8. The amount of energy which flowed in interstate commerce in 1933 exceeded the entire amount generated in the country in 1913.

"The new part 2 of the Federal Water Power Act would constitute the first assertion of Federal jurisdiction over this major interstate public utility. The decision of the Supreme Court in *Public Utilities Commission* v. *Attleboro Steam Co.* (273 U. S. 83) placed the interstate wholesale transactions of the electric utilities entirely beyond the reach of the States. Other features of this interstate utility business are equally immune from State control either legally or practically.

"The necessity for Federal leadership in securing planned coordination of the facilities of the industry which alone can produce an abundance of electricity at the lowest possible cost has been clearly revealed in the recent reports of the Federal Power Commission, the Mississippi Valley Committee, and the National Resources Board. Assertion of the power of the Federal Government in this direction becomes the more important at the time when the Federal Government is compelling the reorganization of holding companies along regional lines. The new part 2 of the Federal Water Power Act seeks to bring about the regional coordination of the operating facilities of the interstate utilities along the same lines within which the financial and managerial control is limited by Title I of the bill."

within the definition of the act, because it "does not own or operate facilities for the transmission of electric energy, or sale of electric energy at wholesale, in interstate commerce." "A person owning or operating facilities . . . must own the facilities which transmit—send across—the energy, and this connotes voluntary, intentional action." From the asserted fact that Jersey Central has no control over the energy produced by it after its delivery to Public Service, petitioners conclude that this short transmission and sale, wholly in New Jersey, is an intrastate transaction. Without this separation from the movement across the New Jersey-New York line, the transmission by Jersey Central would fall within the definition of commerce declared by two former decisions of this Court.

In *Public Utilities Commission* v. *Attleboro Steam Co.*, 273 U. S. 83, 86, this Court held in interstate commerce the sale of locally produced electric current at the state boundary with knowledge that the buyer would utilize the energy extrastate. The passage of custody and title at the line was held immaterial. We see no distinction between a sale at or before reaching the state line.

The other case is *Illinois Gas Co.* v. *Public Service Co.*, 314 U. S. 498. In this case, a wholly-owned subsidiary bought gas in Illinois from its parent corporation. The parent had transported the gas across the state line and delivered it at a reduced pressure to the subsidiary in Illinois. The subsidiary transported the gas wholly intrastate and sold and, on again reducing pressure, delivered it to an Illinois distributing company. The intrastate movement by the subsidiary was held by us to be a part of interstate commerce. We said that the point at which title and custody passed, without arresting movement, did not affect the essential interstate movement of the business.

But we need not decide whether the intervention of Public Service between Jersey Central and Staten Island

Edison and the consequent loss of actual control of the
energy by Jersey Central is significant to distinguish the
two cases just cited. Petitioners, as we understand their
briefs, concede, and rightly so, that power rests in Con-
gress to regulate such a flow of energy from Jersey Central
as here occurs. Such a flow affects commerce. Cf. *Wick-
ard* v. *Filburn,* 317 U. S. 111, and cases cited.[8] But peti-
tioners say that Congress did not intend to exercise its
full power over interstate transmission and directed only
that transmission "in interstate commerce" should be reg-
ulated. As contrasted with "affecting commerce" in the
Public Utility Holding Company Act of 1935, 49 Stat.
803, § 1 (c), or the "current of commerce" in the Com-
modity Exchange Act, 42 Stat. 998, or the broad language
of the Bituminous Coal Act, 50 Stat. 83, or the Agricul-
tural Adjustment Act, 50 Stat. 246, the words "in inter-
state commerce" are said, by petitioners, to be the "strict-
est test of jurisdiction available to Congress." But the
argument, we think, gives no effect to the definition of
"transmitted in interstate commerce" as used in this act.
In the note below there is set out the pertinent provisions
of § 201 which indicate the meaning given the phrase,
which provisions are italicized for quick reference.[9] Sub-
sections (a) and (b) show the intent to regulate such
transactions as are beyond state power under the *Attle-*

---

[8] Cf. *Peoples Natural Gas Co.* v. *Federal Power Comm'n,* 127 F. 2d
153, 157; *Hartford Electric Light Co.* v. *Federal Power Comm'n,* 131
F. 2d 953, 958.

[9] The Federal Power Act of 1935, 49 Stat. 847:

"Section 201. (a) It is hereby declared that the business of trans-
mitting and selling electric energy for ultimate distribution to the
public is affected with a public interest, and that Federal regulation
of matters relating to generation to the extent provided in this Part
and the Part next following and of that part of such business which
consists of the transmission of electric energy *in interstate commerce*
and the sale of such energy at wholesale *in interstate commerce* is
necessary in the public interest, such Federal regulation, however, to

*boro* case, *supra.* Subsection (c) defines the electric energy in commerce as that "transmitted from a State and consumed at any point outside thereof." There was no change in this definition in the various drafts of the bill. The definition was used to "lend precision to the scope of the bill." [10] It is impossible for us to conclude that this definition means less than it says and applies only to the energy at the instant it crosses the state line and so only to the facilities which cross the line and only to the company which owns the facilities which cross the line. The purpose of this act was primarily to regulate the rates and charges of the interstate energy. If intervening companies might purchase from producers in the state of production, free of federal control, cost would be fixed

extend only to those matters which are not subject to regulation by the States.

"(b) The provisions of this Part shall apply to the transmission of electric energy *in interstate commerce* and to the sale of electric energy at wholesale *in interstate commerce,* but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for *such transmission* or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part and the Part next following, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

"(c) For the purpose of this Part, electric energy shall be held to be *transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof;* but only insofar as such transmission takes place within the United States.

.          .          .          .          .

"(e) The term 'public utility' when used in this Part or in the Part next following means any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part."

[10] S. Rep. No. 621, 74th Cong., 1st Sess., p. 49.

prior to the incidence of federal regulation and federal rate control would be substantially impaired, if not rendered futile.

Petitioners make the point, however, that this interpretation subjects connected facilities to the Commission's jurisdiction which facilities were deliberately eliminated by Congress. As an illustration they cite the provisions of § 201 (a) as they appeared in a predecessor bill.[11] We do not think that the result which the petitioners apprehend follows from our interpretation. The language of § 201 (a) and (b) indicates a distinction between the facilities for generation or production and those for transmission. Also, it is sales at wholesale only which are regulated and, finally, Commission power does not extend over all connecting transmitting facilities but only over those which transmit energy actually moving in interstate commerce. Mere connection determines nothing.

Further, we think the definition in subsection (e) of "public utility" covers Jersey Central, since that company owns and operates the transmission line to the Raritan and that line, as a result of the interpretation of interstate commerce in the preceding paragraph, is a facility under Commission jurisdiction by the terms of subsection (b). Subsection (b) declares that the provisions of this part apply "to the transmission of electric energy at wholesale in interstate commerce." This subsection gives jurisdiction over facilities used for such transmission. The business of transmitting and selling electric energy is said

---

[11] S. 1725, 74th Cong., 1st Sess., February 6, 1935:

"The provisions of this title shall apply to the transmission and sale of electric energy in interstate commerce and to the production of energy for such transmission and sale, but shall not apply to the retail sale of energy in local distribution. The Commission shall have jurisdiction over all facilities for such transmission, sale, and/or production of energy by any means and over all facilities connected therewith as parts of a system of power transmission situated in more than one State. . . ."

to be affected with a public interest and federal regulation of a portion of that business is declared necessary. § 201 (a). The fact that a company is engaged in this business is not determinative of its inclusion in this act. The determinative fact is the ownership of facilities used in transmission. Such use makes the owner or operator of such facilities a public utility under the act (e). We conclude, therefore, that Jersey Central is a public utility under this act. It is quite clear, however, from § 201 that although a company may be a public utility under subsection (e), all of its transactions do not thereby fall under the regulatory power of the Commission. In the next section of this opinion, we consider whether this purchase of stock is subject to Commission regulation.

III. Although only the facilities of a public utility used in the transmission or sale at wholesale of electric energy in interstate commerce or the rates and charges for such energy are subjected by Parts II and III of the act to regulation by the Federal Power Commission, that Commission has general power over the issue of all securities or assumption of all obligations by such a public utility.[12] This generality of control is in turn limited by an exception in the case of utilities organized and operating in a state where its security issues are regulated by a state commission.[13]

---

[12] "Sec. 204. (a) No public utility shall issue any security, or assume any obligation or liability as guarantor, indorser, surety, or otherwise in respect of any security of another person, unless and until, and then only to the extent that, upon application by the public utility, the Commission by order authorizes such issue or assumption of liability. . . ."

There is the same extent of control over records and accounts. § 301 (a).

[13] Sec. 204. "(f) The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission."

In the section of Part II in question here, however, which prohibits the purchase of the security of any other public utility, without authorization of the Commission, there is no exception of any kind.[14]   Consequently the action of Jersey Power, admittedly a public utility under Part II, in purchasing the stock of Jersey Central, hereinbefore held to be a public utility under the act, requires Commission approval, unless some other provision of law exempts the transaction from this control.   Petitioners find this exemption in the concluding words of § 201 (a), "such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." [15]   The Commission denies that this limitation is to be read into § 203 (a).   If the limitation is to be read as applying to § 203 (a), the limitation exempts this transaction and the purchase here involved is beyond the reach of Commission power for the reason that the purchase could be and the transfer is regulated by the State of New Jersey.[16]

It will be observed that § 201 (a) is a declaration of the end sought by the enactment of this Part, that is, federal regulation of the generation, transmission and sale of electric energy in commerce.   The sounder conclusion, it seems to us, is that this limitation is directed at generation, transmission and sale rather than the corporate financial arrangements of the utilities engaged in such production

---

[14] "Sec. 203. (a) No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000, or by any means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so. . . ."

[15] See Note 9, *supra.*

[16] § 19 of the Act of April 21, 1911, as amended.   New Jersey Stat. Ann. 48: 3–10.

and distribution. This conclusion finds strong support in the fact that not only § 203 (a), here under discussion, but §§ 204 (a),[17] 208 [18] and 301 (a)[19] regulate matters obviously subject to state regulation. If the scope of the limitation was as broad as petitioners contend, none of these sections just referred to would be effective. Section 203 (a) would be a nullity as of course the disposition and acquisition of facilities, merger, consolidation or purchase of securities by their utilities may be regulated by the states. But this does not follow where a specific limitation is placed on the issue of securities by § 204. Section 204 is not rendered useless by subsection (f) since it is applicable to states without state commissions authorized to regulate security issues. See notes 12 and 13, *supra.* In view of the contemporaneous legislation as to

[17] See Note 12, *supra.*

[18] "Sec. 208. (a) The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

"(b) Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction." 49 Stat. 853, 16 U. S. C. § 824 (g).

[19] "Section 301. (a) Every licensee and public utility shall make, keep, and preserve for such periods, such accounts, records or cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this Act, including accounts, records, and memoranda of the generation, transmission, distribution, delivery, or sale of electric energy, the furnishing of services or facilities in connection therewith, and receipts and expenditures with respect to any of the foregoing: *Provided, however,* That nothing in this Act shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State. . . ." *Id.* 854, 16 U. S. C. § 825.

holding companies (Title I, Public Utility Act of 1935, 49 Stat. 803) which left independent operating companies or subsidiaries of unregistered holding companies free to acquire securities in other operating companies,[20] it is difficult to conclude that by § 201 (a) Congress limited the regulation of the acquisition of securities by § 203 (a).[21]

The legislative history points to this result. When S. 2796, containing the progenitor of the disputed section, was reported by the Committee on Interstate Commerce of the Senate,[22] § 201 (a) concluded:

"It is further declared to be the policy of Congress to extend Federal regulation to those matters which cannot be regulated by the States, and also to exert Federal authority to strengthen and assist the States in the exercise of their regulatory powers and not to impair or diminish the powers of any State commission."

The same bill had §§ 208 (a) and 301 (a), just referred to, which did regulate matters which could be regulated by the states. After its passage through the Senate in this form, the bill went to the House and 201 (a) was there amended by the Committee on Interstate and Foreign Commerce (H. Rep. No. 1318, 74th Cong., 1st Sess., June 24, 1935) to conclude, as it now does, "such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." The report, although it commented on the section, did not mention this change as one of substance from the conclusion of the Senate bill. H. Rep. No. 1318, 74th Cong.,

---

[20] § 9 (a) and (b), 49 Stat. 817.

[21] S. Rep. No. 621, 74th Cong., 1st Sess., p. 50, in referring to what is now § 203 (a), said: "In this way the Commission would have authority to keep the same kind of check upon the creation of spheres of influence among operating companies that the Securities and Exchange Commission has over holding companies under title I."

[22] *Id.*

1st Sess., p. 26. Sections 208 and 301, with their regulation of matters subject to state regulation, remained unchanged. More significant even than these indicia of the scope of the concluding words of § 201 (a) is the fact that the Committee which adopted the new concluding words, adopted also § 204, subsection (f), withdrawing federal regulation from security issues where such issues are "regulated by a state commission." While, of course, this may have been done to make certain that state power would not be infringed, such meticulous care was entirely unnecessary, if the wording of § 201 (a), simultaneously added, had the effect now urged.[23] One might deduce from the language of the report in the House that the precise question at issue here was in the mind of the House Committee and was resolved in accord with our conclusion.[24] From this record of the pains taken by the Congress to make clear the respective responsibilities

---

[23] The language added to § 201 (a) and § 204 (f) is practically identical with the suggestions made by the National Association of Railroad and Utility Commissioners. Senate Hearings, Committee on Interstate Commerce, Public Utility Holding Company Act of 1935, pp. 748–51.

[24] Public Utility Act of 1935, H. Rep. No. 1318, 74th Cong., 1st Sess., General Purpose of Title. "Part II gives control over security issues of interstate operating companies in cases where no State commission has control and over the consolidation, purchase, and sale of interstate operating properties." Page 8.

Sectional Analysis of Bill:

"Section 203. Disposition of Property; Consolidations; Purchase of Securities

"Under the provisions of this section, approval must be secured for the sale, lease, or other disposition by a public utility of all of its facilities subject to the jurisdiction of the Commission, or any part of the facilities in excess of a value of $100,000, and for mergers or consolidations of such facilities or for the purchase by a public utility of the securities of any other public-utility company. Commission approval of an acquisition, consolidation, or control would remove

of federal and state authorities, we conclude that power was given the Federal Power Commission by § 203 to regulate the present transaction.

The judgment of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE ROBERTS:

The sole question is whether Jersey Central Power & Light Company is a public utility within the meaning of subchapter II of the Federal Power Act.

The company's business is the generation of electricity within New Jersey, and distribution of it in the State, principally by retail sale to the public. Its physical property is within New Jersey. It neither owns nor operates any facility which crosses a state line.

Jersey Central exchanges electric energy with another utility, Public Service. The physical hook-up by which this exchange is effected is such that Jersey Central at times transmits electricity to Public Service and at times receives electricity from Public Service. Jersey Central owns and operates a transmission line seven-eighths of a mile long extending from its power plant to another point in the State where the line connects to a cable owned by Public Service running to a station owned by the latter at Perth Amboy, New Jersey. Over these connecting facilities exchanges of two sorts are made. One is of emergency service whereby, in case of a breakdown in either company's system, energy is drawn from that of the other.

such transaction from the prohibitory provisions of any other law." Page 28.

Section 204:

"The requirement of subsection (f) of the Senate bill that applicable State laws must be complied with before Commission approval may be given, has been changed to authorize security issues without Federal approval where such issues are regulated by a State commission in which the public utility is organized and operating." Page 28.

The second is of economy flow energy, delivery of which takes place to either company when the other is able to generate at less cost than the receiving company could with its own facilities. The savings effected by the latter exchange are divided between the companies.

Any flow of electric energy from Jersey Central to Public Service is carried from the point of connection over Public Service cable to a so-called bus bar, a facility of Public Service located in New Jersey having a number of connections, one of which is with a transmission line connecting the Public Service system with that of Staten Island Edison in the State of New York. Over this line Public Service and Staten Island exchange from time to time emergency service. To accomplish this the lines of the two companies are always connected so that, whenever there is demand for additional energy by either company, the current flowing from the plant of the other supplies the deficiency until a speed up of the generators of the receiving company takes care of the load and stops the draught upon the energy supply of the other.

The lines of Jersey Central and Public Service are likewise always connected so that, in case of emergency, some of the energy generated by Jersey Central may pass over the lines of Public Service or vice versa. Thus energy generated by any of the three systems at times reaches that of one of the others in case of a deficiency of generation on the line of that other. This current, passing for short periods from time to time, due to an imbalance of potential between the interconnected systems, is called slop-over current.

Jersey Central has no contractual relations with Staten Island and does not sell it any energy. Jersey Central's relations with Public Service are independent of any contractual relations between the latter and Staten Island. At times when energy is flowing from Jersey Central to Public Service it is also flowing from Public Service to

Staten Island and, in fact, at such times, some of the energy sold by Jersey Central to Public Service passes from Public Service to Staten Island under Public Service's contractual arrangements with Staten Island.

On the basis of these facts, the Commission held that Jersey Central owned and operated transmission facilities utilized for the transmission of electric energy in interstate commerce, and was, therefore, a public utility within the meaning of the Act, although the company sells no electricity directly in interstate commerce.

I am of opinion that the provisions of the Act require the contrary conclusion, and this reading of the statute is powerfully reinforced when the mischief intended to be remedied and the legislative history of the Act are considered.

There is no dispute concerning the exigency which moved Congress to adopt the statute. It had been settled that the transmission and sale of a commodity, such as electricity or gas, produced in one state, transported and furnished directly to consumers in another state, in interstate commerce, did not preclude regulation of the rates to the consumer by the state of delivery.[1] In 1927, however, this court held that where a company generated electric energy and transmitted it, under contract, to another public utility in an adjoining state, at the state line, whence the purchasing company transmitted and sold the energy to its consumers, the rate at which the first company sold to the second was not subject to regulation by the authorities of the state of origination.[2] The court stated: "The rate is therefore not subject to regulation by either of the two States in the guise of protection to their respective local interests; but, if such regulation is required it can only be attained by the exercise of the power vested in Congress." It is clear that the mischief to be

---

[1] *Pennsylvania Gas Co.* v. *Public Service Commission,* 252 U. S. 23.

[2] *Public Utilities Commission* v. *Attleboro Steam Co.,* 273 U. S. 83.

remedied was the incompetence of the states to regulate rates for the sale by the producer of electricity at wholesale to be transmitted and delivered to an extrastate utility at or across a state line. This was the problem and the only problem which confronted the Congress. The legislation itself discloses that, in enacting Part II of the Act, Congress did not go beyond the needs of the situation.

Jersey Central's security issues are not subject to regulation under § 203 unless it is a public utility within the definition of the Act. To determine whether it is, we must turn to § 201. Subsection (e) defines a public utility as "any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part." We must look to other provisions of the section to ascertain what facilities are subject to the Commission's jurisdiction.

Subsection (a) reads: "It is hereby declared that the *business* of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this Part . . . and of that part of such *business* which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, *such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.*" (Italics supplied.)

It is conceded that Jersey Central, as respects generation and sale of the energy in question, and as respects also its security issues, was, at the date of adoption of the federal Act, and still is, subject to regulation under the law of New Jersey, and that law does regulate these matters.[3]

---

[3] N. J. Rev. Stats., 1937, Title 48, chaps. 1 to 3; N. J. Stats. Ann. 48: 1–1 to 48: 3–20.

The nature of Jersey Central's dealing with Public Service certainly does not fairly fall within the scope of the statutory description of the "business" of transmitting and selling electric energy in interstate commerce. But, out of abundance of caution, Congress added that the federal regulation should extend only "to those matters which are not subject to regulation by the States." Language could not be plainer, nor more clearly exclude the present case. Congress desired to fill the gap left by the inability of the states to regulate certain forms of interstate transmission and sale. Congress made clear that it intended to go no further. The opinion of the court ignores this fundamental declaration of purpose and policy and reads as an independent mandate *in vacuo* the words of subsection (e). This I think is not a fair construction.

Subsection (b) provides: "The provisions of this Part shall apply to the *transmission* of electric energy in interstate commerce and to the *sale* of electric energy at wholesale *in interstate commerce, but shall not apply to any other sale of electric energy. . . .*" (Italics supplied.) Here again Congress is at pains to restrict the federal regulation to a commercial transaction in interstate commerce to which the company to be regulated is a party.

The electric current which sometimes reaches Staten Island is, no doubt, "propelled" in some measure by Jersey Central's dynamos, but whether the current shall go to Staten Island or be used within the State is a matter wholly beyond Jersey Central's control in point either of law or of fact. Public Service may or may not choose to transmit and sell the energy interstate as a part of the interstate business which is subject to regulation by the Commission. The current flows beyond the State line only because Public Service maintains wires for that purpose and turns the current into them. What § 201 authorizes the Commission to regulate is "that part of such

business which consists of the transmission of electric energy in interstate commerce." Jersey Central is not engaged in the business of transmitting electric energy beyond the point of connection with Public Service's system, certainly not beyond the bus bar where Public Service alone determines its destination. Nor is Jersey Central engaged in interstate commerce because, after the current reaches the bus bar of Public Service, that company diverts it to Staten Island.

The construction now given to the Act makes the Commission's power to regulate Jersey Central depend, not on the nature of its own business, as § 201 (a) and (b) plainly require, but on the interstate character of the business of Public Service, over which Jersey Central has no control and which is subject to regulation by the Commission. § 201 (b) and (e). I can find no support in the language, history or avowed purposes of the Act for such a construction. Moreover, it is in flat contradiction to the words of § 201 (a), (b), and (e), which, when read together, explicitly exclude from the jurisdiction of the Commission a "person" who "owns or operates facilities" otherwise subject to the jurisdiction of the Commission by providing, in § 201 (a), that the federal regulation is "to extend only to those matters which are not subject to regulation by the States." Jersey Central is engaged in generating electricity which it sells and delivers to Public Service, all within the State. When the present Act was adopted it was not doubted, and in the light of our decisions it could not be, that the seller's business was intrastate and subject to state regulation. The manufacture and sale of a product wholly within a state is not interstate commerce even though the product is destined by the buyer to be shipped out of the state in interstate commerce.[4] That this is equally the case where

---

[4] See *Chassaniol* v. *Greenwood*, 291 U. S. 584; *Parker* v. *Brown*, 317 U. S. 341, 360, 361, and cases cited.

the product produced and sold within the state is gas or electricity is implicit in our decisions.[5] As will presently appear more in detail, while it was the purpose of Congress, in enacting the Federal Power Act to extend the national control over the interstate transmission and sale of electrical energy, which had been held to be beyond the control of the states, the purpose was equally to preserve unimpaired the existing state power of regulation over intrastate production and sale. The provisions of § 201 to which I have referred were introduced into the legislation which became the Federal Power Act in the course of its progress through Congress with the repeatedly declared object of accomplishing that precise purpose.

I submit that to argue that, as Jersey Central's seven-eighths' mile intrastate line which connects with the lines of its intrastate customer, Public Service, is a facility over which flows energy which sometimes ultimately finds its way from Public Service's system into New York, and, hence, a facility for transmission of electric energy interstate, ownership of which subjects the owner to the Commission's jurisdiction, is to tie together two phrases found in separate provisions of the Act and to ignore the statute's provisions viewed in their integrity and entirety. By this process any desired result may readily be reached.

I conclude that the provisions of § 203 [6] relating to regulation of security issues should not be considered since

---

[5] *Union Dry Goods Co.* v. *Public Service Corp.,* 248 U. S. 372; *Public Utilities Commission* v. *Landon,* 249 U. S. 236, 245; *Pennsylvania Gas Co.* v. *Public Service Commission,* 252 U. S. 23; *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, 308; *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, 471; cf. *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165; *Coverdale* v. *Pipe Line Co.,* 303 U. S. 604, 611.

[6] It is to be noted that, even if Jersey Central were a utility within the Act, the proviso in § 201 (a) limits the jurisdiction of the Commission under § 203 respecting the company's acquisition and disposition of facilities and issue of securities, just as it limits the Com-

§ 201 wholly excludes Jersey Central from the scheme of control established by the Act. But if this conclusion were less obvious from the face of the Act, the legislative history is convincing.

When a proposed bill first came before a committee of the House of Representatives, the chairman of the Federal Power Commission, its sponsor, said: [7]

"The new title II of the act is designed to secure coordination on a regional scale of the Nation's power resources and to fill the gap in the present State regulation of electric utilities. *It is conceived entirely as a supplement to, and not a substitute for, State regulation.*" (Italics supplied.)

Section 201 (a) of the bill as presented granted the Commission control of the "production" of electric energy, and "over all facilities" for its transmission and sale in interstate commerce, "and over all facilities connected therewith as parts of a system of power transmission situated in more than one State. . . ."

The National Association of Railroad and Utility Commissioners, while recognizing the need of federal legislation to fill the "gap" created by decisions of this court, urged that the bill, as introduced, would overlap and break down state regulation and submitted amendments designed to avoid this result.[8]

The spokesman for the Association said of these proposed changes:[9] "We have, accordingly, sought to make it as clear as language will that Congress does not in this case intend to regulate anything except interstate power, sold at wholesale." With alterations of expression not

---

mission's authority over other phases of the business, since these matters are subject to regulation, and are, in fact, regulated by New Jersey.

[7] Hearings on H. R. 5423 before House Committee on Interstate and Foreign Commerce, 74th Congress, 1st Session, p. 384.

[8] Hearings, *supra*, pp. 1620, 1622.

[9] *Id.*, p. 1638.

affecting their sense, the proposed amendments of § 201 (a) were embodied in the section as enacted.

I need not follow in detail the changes which were made in the bill in both branches of Congress. Suffice it to say that they progressively emphasized the purpose to regulate only those matters which the states could not regulate.

In reporting the revised bill to the Senate, the Committee said: [10]

"Subsection (a) . . . declares *the policy of Congress to extend that regulation to those matters which cannot be regulated by the States* and to assist the States in the exercise of their regulatory powers, but *not to impair or diminish the powers of any State commission.*" (Italics supplied.)

"Subsection (b) defines the scope of this part of the act and the jurisdiction of the Commission. . . . This subsection leaves to the States the authority to fix local rates even in cases where the energy is brought in from another State. In *Pennsylvania Gas Co.* v. *Public Service Commission* (252 U. S. 23), the Supreme Court held that such rates may be regulated by the States in the absence of Federal legislation. The present bill carefully refrains from asserting Federal jurisdiction over these rates. The rate-making powers of the Commission are confined to those wholesale transactions which the Supreme Court held in *Public Utilities Commission* v. *Attleboro Steam & Electric Co.* (273 U. S. 83), to be beyond the reach of the States."

Notwithstanding the statement in the Senate Committee's report on the Senate bill that "The revision has also removed every encroachment upon the authority of the States," the House, not satisfied that State power had been adequately protected, struck out the entire Senate bill by amendment and substituted a new draft. In pre-

---

[10] Senate Report No. 621, 74th Cong., 1st Sess., p. 48.

senting the amended bill to the House, the Committee reported: [11]

"The new Parts [II and III] are designed to meet the situation which has been created by the recent rapid growth of electric utilities along interstate lines. . . . Under the decision of the Supreme Court of the United States in *Public Utilities Commission* v. *Attleboro Steam & E. Co.* (273 U. S. 83), the rates charged in interstate wholesale transactions may not be regulated by the States. Part II gives the Federal Power Commission jurisdiction to regulate these rates. A 'wholesale' transaction is defined to mean the sale of electric energy for resale and the Commission is given no jurisdiction over local rates even where the electric energy moves in interstate commerce.

"Part II gives control over security issues of interstate operating companies in cases where no State commission has control and over the consolidation, purchase, and sale of interstate operating properties. . . .

"*The bill takes no authority from State commissions* and contains provisions authorizing the Federal Commission to aid the State commissions in their efforts to ascertain and fix reasonable charges. . . . *Probably, no bill in recent years has so recognized the responsibilities of State regulatory commissions as does title II of this bill.*" (Italics supplied.)

In Conference Committee § 201 (a) (b) took its present form, which is the language of the House bill in all particulars here material. In the light of this history it is evident the Congress specifically refrained from the regulation of the business of any utility whose business transactions, especially as respects transmission and sale of energy, state authority could regulate. Such is the instant case.

Both the language of the Act and the legislative history show that Congress did not intend to regulate matters

---

[11] House Report No. 1318, 74th Cong., 1st Sess., p. 7.

affecting commerce, as well as commerce itself. It is interesting to compare, in this connection, other statutes enacted by the same Congress. Three adopted in July and August 1935 covered activities "affecting" commerce; [12] three, including the Federal Power Act in question, adopted in August 1935 did not cover activities "affecting" commerce.[13] Thus the legislature's discriminating use of language argues strongly for denial of the jurisdiction the Commission asserts.

I think the judgment should be reversed.

The CHIEF JUSTICE and MR. JUSTICE FRANKFURTER concur in this opinion.

---

[12] See National Labor Relations Act, § 2 (7), 49 Stat. 449, 450, 29 U. S. C. § 152 (7); Public Utility Holding Company Act, § 1 (c), 49 Stat. 803, 804, 15 U. S. C. § 79 (c); Bituminous Coal Conservation Act, § 1, 49 Stat. 991, 992.

[13] See Federal Power Act, § 201 (b), 49 Stat. 838, 847, 16 U. S. C. § 824 (b); Motor Carrier Act, § 202 (b), 49 Stat. 543, 49 U. S. C. § 302 (b); Federal Alcohol Administration Act, § 3, 49 Stat. 977, 978, 27 U. S. C. § 203.