CITY OF CENTRALIA, WASHINGTON, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 79–7411.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1981.

Decided Nov. 16, 1981.

Grace Powers Monaco, Fairman, Frisk & Monaco, Washington, D. C., for petitioner.

Kristina Nygaard, F.E.R.C., Washington, D. C., argued, for respondent; Andrew M. Zack, Washington, D. C., on brief.

Before WRIGHT and HUG, Circuit Judges, and EAST,* Senior District Judge.

EUGENE A. WRIGHT, Circuit Judge:

The respondent's petition for rehearing is denied. The opinion of July 13, 1981 is withdrawn and is replaced by the following disposition.

\* \* \*

Since 1930 Centralia has operated the Yelm Project, a small hydroelectric plant on the Nisqually River. Additional construction in 1953 doubled Yelm's generating capacity. Before enlarging the plant, Centralia filed a declaration of intention with the Federal Power Commission [1] as required by § 23(b) of the Federal Power Act, 16 U.S.C. § 817.[2]

The Commission, finding that the proposed construction would not affect the interests of interstate or foreign commerce, disclaimed jurisdiction.[3] In 1979, however, it ordered the city to apply for a license.[4] We vacate the order.

---

\* Of the District of Oregon.

1. The relevant functions of the Federal Power Commission (FPC) were transferred to the Federal Energy Regulatory Commission (FERC) on October 1, 1977. 10 C.F.R. § 1000.1(d). The term "Commission" refers to FPC and FERC as appropriate.

2. Section 23(b) provides that a municipality intending to construct a hydroelectric project on "any stream or part thereof, other than those defined herein as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States" must file a declaration of intention with the Commission. 16 U.S.C. § 817.

"[I]f upon investigation [the Commission] shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such ... municipality shall not construct, maintain, or operate" the project without a license. *Id.*

Filing of the declaration of intention became mandatory in 1935, after the initial construction at Yelm was completed. 49 Stat. 846 (August 26, 1935).

3. *City of Centralia*, Docket No. E–6454: "Finding of the Commission" (FPC, May 8, 1953).

4. *City of Centralia*, Docket No. E–6454: Opinion No. 40, "Opinion and Order Affirming Initial Decision" (FERC, April 30, 1979); Opinion No. 40–A, "Opinion and Order Denying Petition for Rehearing and Motion for Stay of Order" (FERC, June 28, 1979). The Initial Decision of the ALJ was issued March 22, 1978.

## I. FACTS AND PROCEEDINGS

Centralia is a city in Lewis County of about 11,000.[5] The Nisqually River is a glacial stream that originates on Mount Rainier and empties into Puget Sound. The Yelm Project generates 10,000 kw, supplying about 60% of Centralia's electricity. Other power is supplied by the Bonneville Power Administration (BPA).[6]

Centralia normally uses all power generated by Yelm. On occasion, usually in the early morning hours, excess Yelm power flows intrastate on BPA lines to the Lewis County Public Utility District (PUD).[7] Although the BPA transmits electricity to four states, lines between Centralia and Lewis County PUD form a closed loop. Electricity generated by Yelm never flows beyond Washington's borders.

Both an administrative law judge (ALJ) and the Commission concluded that a license was required for the Yelm Project. They rejected Centralia's contention that the Commission was estopped by its prior disclaimer of jurisdiction.

The ALJ found that Yelm affected interstate commerce because of its connection with the BPA system. He suggested that failure of the Yelm plant could cause a major BPA blackout.

The Commission found no likelihood of a blackout but determined that the requisite effect on commerce was established by Yelm's ties to the BPA and resulting variations, however minor, in BPA's interstate power transmissions.

## II. THE PRIOR DISCLAIMER

Centralia contends that the Commission's 1953 disclaimer precludes the assertion of

jurisdiction now. But the disclaimer "did not constitute permission to maintain the project license-free in perpetuity." *Connecticut Light & Power Co. v. FPC*, 557 F.2d 349, 354 (2d Cir. 1977). Congress has given no indication that such a determination "forever oust[s] the Commission of jurisdiction." *Nantahala Power & Light Co. v. FPC*, 384 F.2d 200, 210 (4th Cir. 1967), *cert. denied*, 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1134 (1968).

> When . . . the Commission determines that a change in the underlying facts, or a correct exposition of the applicable law, discloses that the facility does affect commerce, continued maintenance and operation is conditioned upon the procurement of a license.

*Id.* 384 F.2d at 206.

Although the present case differs in important respects from *FPC v. Union Electric Co.*, 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965) [hereinafter cited as *Taum Sauk*], the latter does clarify key principles. The Commission has determined that, under *Taum Sauk*, Yelm has the requisite effect on commerce. We need not agree with the Commission's finding to recognize that *Taum Sauk* gave it "an expanded jurisdictional basis." *Connecticut Light & Power Co.*, 557 F.2d at 353. The Commission's reconsideration of its 1953 determination was not unwarranted.

## III. JURISDICTION AND THE COMMERCE POWER

The Commission has licensing jurisdiction over hydroelectric projects on nonnavigable

The current proceeding arose when the Nisqually Tribe of Indians complained to the Commission in *City of Tacoma*, Docket No. P–1862, that hydroelectric projects operated by Tacoma were causing harm to anadromous fish runs on the Nisqually River. Tacoma moved in January 1977 that Centralia be joined as a necessary party in *City of Tacoma* or be required to apply for a license for the Yelm Project.

After the Commission's final action, a motions panel of this court granted a stay of the licensing order pending review. *Centralia v. FERC*, 650 F.2d 1117 (9th Cir., 1979).

5. *See* U. S. Bureau of the Census, 1980 Census of Population and Housing: State of Washington (Final Count).

6. BPA is a federal agency that provides electric power in Idaho, Montana, Oregon, and Washington.

7. Centralia insists that the reverse flow is minimal and predicts that there will be none by 1983. Until 1975 the city received credit from BPA for the reverse flow. Now, apparently, it does not.

streams within Congress's jurisdiction whenever the interests of interstate commerce would be affected by such projects. 16 U.S.C. § 817.

*Taum Sauk* established that the affected interests need not be interests of navigation or water commerce. 381 U.S. at 96, 85 S.Ct. at 1256. Rather, "Congress drew upon its full authority under the Commerce Clause, including but not limited to its power over water commerce." *Id.*

"[T]he comprehensive development of water power . . . was the central thrust of the [Federal Power] Act." *Id.* at 101, 85 S.Ct. at 1259. Therefore, "[t]he purposes of the Act are more fully served if the Commission must . . . consider the impact of the project on the full spectrum of commerce interests." *Id.*

We must ascertain, in light of these principles, whether the Commission correctly determined that the Nisqually is a stream within Congress's jurisdiction under the commerce power and that Yelm affects interstate commerce. 16 U.S.C. § 825*l*(b).[8]

### A. The Nisqually River

The ALJ assumed, without deciding, that the Nisqually is nonnavigable.[9] Centralia emphasizes that § 23(b) requires licensing of projects on nonnavigable streams only when Congress has jurisdiction over such streams under its authority to regulate commerce. It cites *Taum Sauk*'s acknowledgement of the "theoretical possibility" that there are projects affecting commerce but exempt from licensing because they are "located on intrastate nonnavigable waters which do not flow into any navigable streams." 381 U.S. at 97 n.9, 85 S.Ct. at 1257 n.9.

The Nisqually River flows into Puget Sound, which is navigable but not a "stream." *Taum Sauk* involved the headwaters of a navigable river system. *Id.* at

93, 85 S.Ct. at 1255. The Commission maintains that the Court's references to "streams" reflected this fact and implied no exclusion of other navigable waters. The Court did not refer exclusively to streams; it also stated that "persons constructing projects on nonnavigable feeders of navigable *waters* [must] file a declaration of intention." *Id.* at 108, 85 S.Ct. at 1263 (emphasis added).[10]

We do not decide whether there is a jurisdictional distinction between a nonnavigable stream that flows into a navigable stream and one that flows into the ocean, but assume for purposes of this decision that Congress does have jurisdiction over the Nisqually.

### B. The Effect on Commerce

The key issue is whether Yelm's connection to BPA, without more, establishes the requisite effect on commerce. As the Commission observed, this issue is not squarely resolved by *Taum Sauk*. The Taum Sauk facility was intended to transmit power interstate. The Court remarked in dictum:

> The project located on a nonnavigable stream, without any effect on navigability and water commerce and without any interstate sales, may well have no effect on commerce among the States and thus be beyond the power of Congress under the Commerce Clause.

*Id.* at 110 n.29, 85 S.Ct. at 1264 n.29.

### 1. Connection to BPA

Although Yelm power is not actually transmitted in interstate commerce, the ALJ found the requisite effect on commerce in the "electromagnetic interlock" between Yelm and the BPA system. He concluded:

> Centralia . . . clearly affects the interests of interstate commerce in that the

---

8. We defer to the Commission's expertise in interpreting the statute it administers. *See Nevada Power Co. v. FPC*, 589 F.2d 1002, 1005 (9th Cir. 1979). In this case, however, we face questions of constitutional power and of factual support for its exercise.

9. *See* FERC Opinion No. 40 at 2 & n.6.

10. *See also* 16 U.S.C. § 796(8) (navigable waters include "parts of streams or other bodies of water over which Congress has jurisdiction").

amount of power it generates or fails to generate affects the flow of interstate energy, increasing or decreasing the amount of power other generating units in the interstate network must produce to keep the system balanced.

Initial Decision of ALJ at 15.

The Commission found that excess Yelm power has on occasion commingled with BPA power destined for Lewis County, "reduc[ing] the amount that suppliers of power to the BPA grid, including out-of-state generators, are required to contribute." Opinion No. 40 at 11.

Finding also that the amount of power generated by the Yelm plant affects the amount demanded by Centralia from BPA, the Commission concluded: "[T]he Yelm Project, by virtue of its connection to the BPA interstate system alone, affects interstate commerce." Id. at 12 (footnote omitted).[11]

Centralia argued that transmission of Yelm power to Lewis County is rare, and pointed out that no power so transmitted crosses state lines. The Commission acknowledged that the effect on commerce is

"minor," but maintained: "The fact that the effect of the Yelm Project on interstate commerce is very small ... is not significant to the Commission's jurisdiction." Id. (footnote omitted).

### 2. Commerce Clause Principles

The ALJ correctly assumed that commerce clause cases in other areas of regulation are relevant to the issue presented here, but the Commission erroneously chose to disregard those cases.[12] Had it recognized their force, its finding might not have been crucially deficient.

■ If a local activity belongs to a class of activities having a cumulative effect on interstate commerce, it may fall within the commerce power. See, e. g., Perez v. United States, 402 U.S. 146, 150–54, 91 S.Ct. 1357, 1359–61, 28 L.Ed.2d 686 (1971); Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942); United States v. Helsley, 615 F.2d 784, 787 (9th Cir. 1979).

But the effect on the national interest must be "real and substantial." Heart of

---

**11.** The Commission stated that Yelm affects commerce "by reason of (a) its power being commingled with power from BPA's interstate grid which flows intrastate to third parties, and (b) its effect on power flows on BPA's interstate grid arising from its connection with that grid." Opinion No. 40 at 14.

The only specific consequence of Yelm's connection with the BPA grid even suggested by the Commission is the possibility of some small, indirect effect on the quantity of electricity transmitted across state lines. As the Supreme Court remarked in a different but relevant context, "[m]ere connection means nothing." Jersey Central Power & Light Co. v. FPC, 319 U.S. 61, 72, 63 S.Ct. 953, 959, 87 L.Ed. 1258 (1943).

In Jersey Central, which involved Part II of the Federal Power Act, there was substantial evidence that the plant's facilities were "utilized for the transmission of electric energy across state lines." Id. at 67, 63 S.Ct. at 956. Connecticut Light & Power Co. v. FPC, 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150 (1945), also involved facilities transmitting electricity "in interstate commerce." See 16 U.S.C. § 824(a). Here, in contrast, there is no evidence of interstate transmission.

Indiana & Michigan Electric Co. v. FPC, 365 F.2d 180 (7th Cir.), cert. denied, 385 U.S. 972, 87 S.Ct. 509, 17 L.Ed.2d 435 (1966), emphasized

the significance of electromagnetic interlock in a power system. 365 F.2d at 183. Again, however, interstate transmission was involved.

**12.** The ALJ cited Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and other commerce clause cases, concluding that they require a "close and substantial link" between interstate commerce and the regulated activity. Initial Decision of ALJ at 13–14.

The Commission deemed the cited cases irrelevant because they "do not treat with [sic] analogous statutes." Opinion No. 40 at 10 (footnote omitted). Taum Sauk, however, establishes that § 23(b) jurisdiction invokes the full scope of congressional power under the commerce clause. 381 U.S. at 101, 85 S.Ct. at 1259. Cases interpreting the scope of the commerce power are clearly pertinent. See id. at 95, 85 S.Ct. at 1256 (citing Katzenbach v. McClung, 379 U.S. 294, 301–04, 85 S.Ct. 377, 382–83, 13 L.Ed.2d 290 (1964) (civil rights)).

Commissioner Holden detected this error in the majority's approach. Concurring opinion at 1.

*Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255, 85 S.Ct. 348, 356, 13 L.Ed.2d 258 (1964); *accord, Katzenbach v. McClung*, 379 U.S. 294, 302, 85 S.Ct. 377, 382, 13 L.Ed.2d 290 (1964); *Rasmussen v. American Dairy Ass'n*, 472 F.2d 517, 522–24 (9th Cir. 1972), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

■ When Congress determines that a specific activity or a class of activities has a real and substantial effect on commerce, the courts will uphold that determination if it has a rational basis. *Katzenbach v. McClung*, 379 U.S. at 303–04, 85 S.Ct. at 383–84; *see Perez v. United States*, 402 U.S. at 154, 156–57, 91 S.Ct. at 1361, 1362–63.

■ When the Commission is assigned the task of determining whether an activity affects commerce, however, we review the record on which the determination is based. Only if the Commission's finding is supported by substantial evidence is it conclusive. 16 U.S.C. § 825*l*(b). *Cf. Rasmussen v. American Dairy Ass'n*, 472 F.2d at 524 (Sherman Act gives courts duty to determine whether activity has requisite effect on commerce).

### 3. A Real and Substantial Effect?

The only substantial effect on commerce specifically identified by the ALJ was the supposed possibility of a system-wide blackout. He stated:

> The interdependency of utilities within a power system is so extensive that the impact of a generating failure in one unit may sweep through the entire system, with devastating disruption of interstate commerce, like that which occurred dur-

ing the great power blackout of several Northeastern states in the 1960's.

Initial Decision of ALJ at 14.

The Commission rejected the ALJ's suggestion that failure of the Yelm Project threatened a major BPA blackout. It stated: "[T]here is nothing in the record to show the potentially disruptive consequences of failure of a generating unit such as the Yelm Project." Opinion No. 40 at 10 (footnote omitted). Citing its own studies, the Commission noted that the cause of the 1965 Northeast power blackout "was failure of a backup relay on a main transmission line, an event not remotely comparable to outage of a small plant such as the Yelm Project." *Id.* n.23.[13]

The Commission's finding therefore rests on the assumption that the occasional intrastate reverse flow from Yelm to Lewis County, together with Yelm's effect on the amount of power purchased by Centralia from BPA, influences the levels of BPA power transmitted to or from Washington. The Commission further assumes that this influence, however slight, necessarily amounts to a substantial effect on interstate commerce.

The record fails to support the Commission's assumptions or its finding. It does not demonstrate that a reduction in the amount of power generated at Yelm would necessarily lead to increased consumption of BPA power generated in another state. Such reduction might instead be accompanied by reduced consumption in Centralia or increased consumption of power generated elsewhere in Washington.[14]

■ Moreover, the record fails to show that any changes in interstate transmission traceable to Yelm's intrastate activities have a nontrivial qualitative effect on interstate commerce.[15] Indeed, the Commission

13. The Commission also noted that no failure had previously occurred at Yelm. Opinion No. 40 at 10.

14. Commissioner Holden suggested that the ALJ could take notice of electrical facts not put into the record by the parties. Concurring opinion at 2. But he did not identify any such facts or explain how they might have supported the finding of a substantial effect on commerce. *See id.*

15. The commerce clause, of course, sets no quantitative minima for the isolated effects of individual activities, provided the cumulative effect of such activities is real and substantial. *See Rasmussen v. American Dairy Ass'n*, 472 F.2d 517, 524 (9th Cir. 1972), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

acknowledged that Yelm's effect is "very small,"[16] and it never identified any class of projects to which Yelm may belong to show that activities at such plants have a substantial cumulative effect. *Cf. Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 202, 95 S.Ct. 392, 402, 42 L.Ed.2d 378 (1974) (in antitrust cases, substantial effect on commerce may not be presumed); *accord, McLain v. Real Estate Board*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980).

 Although Congress might have a rational basis for determining that certain local power plants, taken together, substantially affect interstate or foreign commerce, the Commission lacked substantial evidence on this record to find that the Yelm Project has the requisite effect. Its order must be set aside.

## IV. DISPOSITION

 As both the ALJ and the Commission noted, the staff made no assertion that the Nisqually is navigable and presented no evidence of navigability.[17] The state attorney general, representing two intervening state agencies, attempted to raise the issue several weeks after the prehearing conference.

The ALJ observed that "[n]o party present [at the conference] even indicated navigability as an issue." Notice to the Parties (January 11, 1978). He concluded that "raising of the issue of navigability is not timely." *Id.* Nevertheless, both the ALJ and the Commission purported to "reserve" the issue for future decision in the event their alternative theories of jurisdiction failed.[18]

The action of the Commission and its staff has caused delay, unreasonable expense to the city, and an imposition on the court. New proceedings will require the city to participate in additional protracted hearings and to bear the resulting costs.

We hesitate to sacrifice adjudicative economy and finality by permitting the Commission to burden the city with a proceeding on a voluntarily waived or bypassed ground of jurisdiction so speculative that it was not raised initially. But we must conclude that the FERC is not precluded from asserting jurisdiction in the future on the basis of navigability.

The order of the Commission is vacated.

---

But the commerce power does not extend to local activities having effects so trivial, individually and cumulatively, that their relationship to commerce is "too tenuous in a practical sense to warrant federal control." *Id.* (quoting Stern, *The Commerce Clause and the National Economy*, 1933–1946 (Part 1), 59 Harv.L.Rev. 645, 673 (1946)).

16. As Commissioner Holden observed, The Commission appears to question whether the 'close and substantial link' test is met." Concurring opinion at 1.

17. Section 23(b) provides that a municipality may not operate a hydroelectric project "across, along, or in any of the navigable waters of the United States" without a license. 16 U.S.C. § 817. *See Puget Sound Power & Light Co. v. FERC*, 644 F.2d 785, 786–87 (9th Cir. 1981).

18. *See* note 9, *supra*.