**DUKE POWER COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 20578.

United States Court of Appeals District of Columbia Circuit.

Argued March 7, 1967.

Decided June 28, 1968.

Mr. Steve C. Griffith, Jr., Charlotte, N. C., with whom Mr. Charles W. Smith, Washington, D. C., was on the brief, for petitioner.

Mr. Howard E. Wahrenbrock, Sol., Federal Power Commission, at the time of argument, with whom Messrs. Richard A. Solomon, Gen. Counsel, Drexel D. Journey, Asst. Gen. Counsel, and Leonard D. Eesley, Sp. Asst. to Gen. Counsel, Federal Power Commission, were on the brief, for respondent.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

ROBINSON, Circuit Judge:

This litigation presents the question whether the Federal Power Act [1] requires an interstate electric utility to obtain approval by the Federal Power Commission of its acquisition of facilities utilized in the local distribution of electric energy. Section 203(a) [2] of the Act bans, in the absence of the Commission's authorizing order, the disposition by such a utility of "the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000," and the merger or consolidation of "such facilities or any part thereof with those of any other person." In the proceeding under review, the Commission, applying this section to undisputed facts, answered the question in the affirmative.[3]

Duke Power Company, a utility subject to the Act,[4] conducts some of its activities in South Carolina. With the approbation of that state,[5] it bought from Clemson University, an agency exempted from the operation of the Act [6] facilities [7] which Clemson had previously employed in off-campus distribution of electricity to customers in two South Carolina counties.[8] As the Commission found, Duke thereby "acquired only seven miles of distribution line and 418 service connections to be supplied from its system in the same way they had before the acquisition." [9]

The Commission learned of the transaction several months later when Duke submitted proposed journal entries to record it.[10] Citing Section 203(a) and its own regulation,[11] the Commission

1. 49 Stat. 838 (1935), 16 U.S.C. §§ 791a to 825r. The Federal Power Act is a tripartite affair. Part I, pertaining to licensure of water power projects, was the Federal Water Power Act, 41 Stat. 1063 (1920), 16 U.S.C. §§ 791a to 823, with minor modifications in 1935. Parts II and III were enacted as Title II of the Public Utility Act of 1935, 49 Stat. 838 (1935), Title I of which was the Public Utility Holding Company Act of 1935, infra note 35. Part II, 16 U.S.C. §§ 824 to 824h, contains the substantive regulatory provisions and Part III, 16 U.S.C. §§ 825 to 825u, the procedural and administrative provisions, associated with the regulation of licensees under Part I and interstate utilities under Part II.

2. 16 U.S.C. § 824b(a), quoted in relevant part infra p. 1599.

3. In re Duke Power Co., 36 F.P.C. 399 (1966).

4. Duke, a North Carolina corporation, is primarily an electric utility serving areas in that state and in South Carolina. It admits its subjectivity to the Act. See infra p. 1599.

5. See note 12, infra.

6. Clemson is an educational institution wholly owned and operated by the State of South Carolina. This circumstance, without more, excepted it from the provisions of the Act. Federal Power Act § 201(f), 16 U.S.C. § 824(f).

7. The transaction also included certain water distribution facilities, which are not involved in this litigation. The total price paid was $279,068.

8. Clemson's customers were largely university personnel residing near its campus. Being without generating facilities of its own, Clemson purchased on a wholesale basis from Duke all of the power it required. Duke drew power from its generating and transmission system, and delivered it to Clemson at a distribution voltage of 4,160. The step-down transformers by which the voltage was reduced, and the substation at which the delivery was effected, were owned by Duke.

9. In re Duke Power Co., supra note 3, 36 F.P.C. at 403.

10. 18 C.F.R. pt. 101, Balance Sheet Accounts 102B (1947).

11. "The requirements of this part will apply to public utilities seeking authority under section 203 of the Federal Power Act. This authority extends to * * * (2) The merger or consolidation, directly or indirectly of the facilities of a public utility with those of any other person having a value in excess of $50,000. This includes the acquisition by a public utility of electric facilities of any other person whether or not this person is otherwise subject to provisions of Part II of the Federal Power Act (including municipalities and companies not engaged in the interstate transmission or sale of electric energy)." 18 C.F.R. § 33.1 (1963).
Section 203(a) of the Act, 16 U.S.C. § 824b(a), quoted in part infra p. 1599,

then asked Duke to file an application for approval.[12] Duke's rejoinder was a request for an order disclaiming jurisdiction over the purchased facilities. The Commission thereupon initiated a declaratory proceeding [13] which culminated in its determination that "[b]y acquiring the facilities of Clemson * * * Duke merged or consolidated its facilities with those of another person without having secured an order of the Commission authorizing it to do so as required by Section 203 of the Federal Power Act and" the Commission's regulation.[14] Duke's timely petition for rehearing was denied,[15] and the case is here for our review of the Commission's ruling.[16]

We hold that Section 203(a), properly construed, is inapplicable to the transaction in suit. We accordingly reverse the Commission's order and remand the proceeding for a declaration consistent with this opinion.

## I

Section 203(a) in pertinent part provides that

"No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000, or by any means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so."

We note, at the outset, that the prohibitions forged by this section are imposed only upon a "public utility." [17] Duke freely admits that it is a public utility within the purview of the Act, and in this proceeding the Commission, adher-

restricts the Commission's regulatory authority over a public utility's disposition of jurisdictional facilities to those having a value in excess of $50,000, but imposes no value limitation upon its authority over acquisitions. The $50,000 limitation the Commission's regulation specifies is an exercise of its rulemaking power, Federal Power Act § 309, 16 U.S.C. § 825h, as to the validity of which we need not express an opinion since the Commission found that the electric facilities Duke acquired exceeded $50,000 in value. In re Duke Power Co., *supra* note 3, 36 F.P.C. at 405.

12. As previously stated, the transaction, on Clemson's application, had already won advance approval by the Public Service Commission of South Carolina, which found that the price Duke was to pay "is fair and adequate consideration," that Duke "will provide the present and potential customers served by the [electric and water distribution] systems to be sold with adequate and equivalent service," and "[t]hat it is in the public interest that the said sale be approved and that the applicant be permitted to discontinue service upon service being taken over by the purchaser in that the public will be served without interruption and that the service furnished will be adequate and equivalent in all respects and that the applicant will be relieved of the expenses

and burden of extending and enlarging its facilities off its campus."

13. The Commission noted that "[i]n essence, the request calls for a reconsideration of the validity of Section 33.1(2) of the Commission's Regulations," *supra* note 11, "under the Federal Power Act, as amended on March 23, 1963 (28 F.R. 2900). The legality of the rule has never been considered in a contested proceeding and we believe that a declaratory order as to the application of Section 203 of the Act and Section 33.1(2) of the Regulations in the present situation would be in the public interest." In re Duke Power Co., 35 F.P.C. 230 (1966).

14. In re Duke Power Co., *supra* note 3, 36 F.P.C. at 405.

15. Federal Power Act § 313(a), 16 U.S.C. § 825*l*(a).

16. Federal Power Act § 313(b), 16 U.S.C. § 825*l*(b).

17. "The term 'public utility' when used in this Part or in the Part next following means any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part." Federal Power Act § 201(e), 16 U.S.C. § 824(e). Sections 201 and 203 are components of Part II of the Act, which contains the substantive provisions applicable to operating electric utilities. See note 1, *supra*.

ently with an earlier determination,[18] found that it was.[19]

Not all of the activities of a public utility, however, are subjected to the regulatory authority of the Commission.[20] We mention now, and discuss later,[21] the historical fact that the Act is not an exertion of the full national power over interstate electric utilities, but a delineation, consciously and carefully made, of the operations Congress decided to render amenable to federal control. Duke was obliged to honor the requirement the Commission invoked only if its acquisition from Clemson was a transaction to which that requirement applied.[22]

Analysis of Section 203(a) reveals three activities that are forbidden unless authorized by the Commission, of which two quite obviously are not involved in this case. The first is a sale, lease or other disposition by a public utility "of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,-000." No such disposition by Duke engages our attention and, as the Commission held,[23] Clemson was not a "public utility."[24] The second inapplicable prohibition is the purchase, acquisition or

taking by one public utility of a security of another public utility. Nothing of that character occurred here. Our question relates to the remaining injunction —"No public utility shall * * * by any means whatsoever, directly or indirectly, merge or consolidate *such facilities* or any part thereof with *those of any other person*, * * * without first having secured an order of the Commission authorizing it to do so."[25] The Commission felt that, by taking over Clemson's distribution system, Duke "merged or consolidated" its preexisting facilities with "those of another person."[26]

We accept the Commission's conclusion that the "merge or consolidate" clause encompasses acquisitions[27] of facilities,[28] and we share the parties' view that the words "such facilities," adverting to the facilities of the public utility with which the acquired facilities are incorporated, must be "facilities subject to the jurisdiction of the Commission." The controversy here centers upon the reference properly supplied by the phrase "those of any other person," which points to the facilities procured for the incorporation. Duke argues that the antecedent of

18. In re Duke Power Co., 28 F.P.C. 255 (1962). There the Commission found Duke to be "a public utility within the meaning of Section 204," and a proposed issuance and sale of bonds to "constitute an issuance of securities within the purview of Section 204 of the Act" and thus subject to prior authorization by the Commission. Id. at 256.

19. In re Duke Power Co., *supra* note 3, 36 F.P.C. at 405.

20. FPC v. Southern California Edison Co., 376 U.S. 205, 208 n. 3, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964); Connecticut Light & Power Co. v. FPC, 324 U.S. 515, 524–525, 65 S.Ct. 749, 89 L.Ed. 1150 (1945); Jersey Central Power & Light Co. v. FPC, 319 U.S. 61, 73, 63 S.Ct. 953, 87 L. Ed. 1258 (1943).

21. Part II hereof.

22. Compare Jersey Central Power & Light Co. v. FPC, *supra* note 20, 319 U.S. at 73–78, 63 S.Ct. 953.

23. In re Duke Power Co., *supra* note 3, 36 F.P.C. at 405.

24. See also note 6, *supra*.

25. The emphasis is supplied.

26. In re Duke Power Co., *supra* note 3, 36 F.P.C. at 405.

27. Transactions of an acquisitional nature fall easily within the language of the "merge or consolidate" clause which, if limited to dispositive exploits, would largely be a nullity since the first clause of § 203(a) decrees Commission approval whenever a public utility proposes to "sell, lease, or otherwise dispose of" all of its jurisdictional facilities or any part exceeding $50,000 in value.

28. The clause under consideration speaks of the merger or consolidation of "facilities," not corporate entities. It expressly includes transactions involving less than all of a corporation's assets, as would not ordinarily be the case where a true merger or consolidation of corporations occurs.

"those" is the phrase, "such facilities," language in turn referring to "facilities subject to the jurisdiction of the Commission," and points out that Clemson's distribution system fell outside the latter category. The Commission, on the other hand, would have us ascribe to the phrase "those [facilities] of any other person" sufficient breadth to include both jurisdictional and nonjurisdictional facilities.

By our estimate, we face a constructional problem of which the bare statutory words admit confidently of no single solution. They do not inexorably preclude Commission supervision of proposed combinations of interstate and intrastate facilities, but neither do they unambiguously endow the Commission with authority to do so. We feel that, without crystallization extrinsically, they can be read either way, with the result that we cannot safely confine the scope of our inquiry to their grammatical potentialities. Here, as in any similar context, we are impelled to resort instead "to all the aids available in the process of construction, to history and analogy and practice as well as to the dictionary." [29]

## II

Until 1927, state commissions exercised ratemaking jurisdiction over sales by public utilities of electric energy, including energy transmitted over interstate lines.[30] In that year came the celebrated *Attleboro* decision [31] to the effect that the states are constitutionally incapable of fixing the rates at which sales at wholesale in interstate commerce are to be made.[32] In the *laissez-faire* milieu thus created utility holding companies flourished, and behind the *Attleboro* shield abuses became flagrant.[33] It was to correct these abuses that, with the strong support of President Roosevelt,[34] Congress enacted the Public Utility Holding Company Act of 1935 [35] to bring the holding companies under federal governance.[36] And it was primarily to fill the "Attleboro gap" [37] that Congress concomitantly passed the Federal Power Act [38] as its first exertion of national authority over the operating electric utilities.[39]

29. Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 317, 53 S.Ct. 350, 359, 77 L.Ed. 796 (1933).

30. See, *e.g.*, Summary Report of the Federal Trade Commission, S.Doc.No. 92, part 73–A, 74th Cong., 1st Sess. 1-28 (1935).

31. Public Utilities Comm'n of Rhode Island v. Attleboro Steam & Elec. Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927).

32. The *Attleboro* doctrine had its origins in cases dealing with the regulation of sales of interstate gas, wherein there had developed the distinction between retail sales directly to consumers, over which the states might exert authority, and distributions for resale, over which they could not. See the discussion in FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 213–215, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964).

33. See, *e.g.*, Summary Report of the Federal Trade Commission, S.Doc.No. 92, part 73–A, 74th Cong., 1st Sess. 72–75 (1935); Report of National Power Policy Committee on Public Utility Holding Companies, S.Rep.No. 621, 74th Cong., 1st Sess.App. 55–57 (1935).

34. H.R.Doc.No. 137, 74th Cong., 1st Sess. (1935). See also S.Rep.No. 621, 74th Cong., 1st Sess. 2–4 (1935); H.R.Rep. No. 1318, 74th Cong., 1st Sess. 1–3 (1935).

35. 49 Stat. 803 (1935), 15 U.S.C. §§ 79 to 79z-6. See note 1, *supra*.

36. See, *e.g.*, Hearings on S. 1725 Before the Senate Committee on Interstate Commerce, 74th Cong., 1st Sess. 343–45 (1935), hereinafter cited "Hearings on S. 1725."

37. Commonly so referred to, in varying forms, throughout the legislative hearings and debates. See also note 39, *infra*.

38. See note 1, *supra*.

39. See S.Rep.No. 621, 74th Cong., 1st Sess. 17 (1935); H.R.Rep.No. 1318, 74th Cong., 1st Sess. 7–8 (1935); FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 213, 84 S.Ct. 644; United States v. Public Utilities Comm'n, 345 U.S. 295, 307–308, 311, 73 S.Ct. 706, 97 L.Ed. 1020 (1953); Connecticut Light & Power Co. v. FPC, *supra* note 20, 324 U.S. at 524, 65 S.Ct. 749, 89 L. Ed. 1150; Jersey Central Power & Light Co. v. FPC, *supra* note 20, 319 U.S. at

Congress did not, however, in formulating the proscriptive provisions of the Power Act, undertake to exhaust its constitutional prerogatives.[40] While by no means confined in its coverage to areas legally immune from state control,[41] the Act's major emphasis is upon federal regulation of those aspects of the industry which—for reasons either legal or practical—are beyond the pale of effective state supervision.[42] A federal-state balance of authority, by which this general objective was to be achieved, was not only a characteristic solemnly declared when the legislation was proffered for enactment,[43] but is also a feature evident from many sections of the Act,[44] of

which perhaps two contain the most vivid expression.

Section 201(a) declares the necessity in the public interest for federal regulation in the electric utility field, partially of "matters relating to generation" and wholly "of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce."[45] But with a congressional purpose to impose "Federal regulation only over those matters which cannot effectively be controlled by the States," [46] that section further provides that "such Federal regulation, however, [is] to extend only to those matters which are not

67–68, 70–71, 63 S.Ct. 953, 87 L.Ed. 1258.

40. See Connecticut Light & Power Co. v. FTC, *supra* note 20, 324 U.S. at 525–31; Jersey Central Power & Light Co. v. FPC, *supra* note 20, 319 U.S. at 76–77, 63 S.Ct. 953, 87 L.Ed. 1258.

41. See *e.g.*, Federal Power Act §§ 202(b), 204, 301; 16 U.S.C. §§ 824a(b), 824c, 825.

Section 203 was likewise added with full awareness that this was not a provision needed to close a constitutional gap, and that the states had jurisdiction to accomplish this regulation. Hearings on H.R. 5423 Before the House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess. 560 (1955), hereinafter cited "Hearings on H.R. 5423." That the states did and do have such constitutional jurisdiction is clear. See Jersey Central Power & Light Co. v. FPC, *supra* note 20, 319 U.S. at 74–75, 63 S. Ct. 953.

42. See Connecticut Light & Power Co. v. FPC, *supra* note 20, 324 U.S. at 524, 84 S.Ct. 644, 11 L.Ed.2d 638; Jersey Central Power & Light Co. v. FPC, *supra* note 20, 319 U.S. at 70–71, 63 S.Ct. 953.

43. See note 39, *supra*.

44. See *e.g.*, Federal Power Act §§ 201(a)–(b), 202, 204(f), 209, 16 U.S.C. §§ 824(a)–(b), 824a, 824c(f), 824h.

45. "It is hereby declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided

in this Part and the Part next following and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." Federal Power Act § 201 (a), 16 U.S.C. § 824(a).

46. "The revision [of the Senate Committee on Interstate Commerce] has * * * removed every encroachment upon the authority of the States. The revised bill would impose Federal regulation only over those matters which cannot effectively be controlled by the States." S.Rep.No. 621, 74th Cong., 1st Sess. 18 (1935).

In similar vein, the House Committee on Interstate and Foreign Commerce said: "The bill takes no authority from State commissions and contains provisions authorizing the Federal Commission to aid the State commissions in their efforts to ascertain and fix reasonable charges. Provision is made for joint boards composed of members of State commissions which may be used for this purpose. The new parts are so drawn as to be a complement to and in no sense a usurpation of State regulatory authority and contain throughout directions to the Federal Power Commission to receive and consider the views of State commissions. Probably, no bill in recent years has so recognized the responsibilities of State regulatory commissions as does title II of this bill." H.R. Rep.No. 1318, 74th Cong., 1st Sess. 8 (1935).

subject to regulation by the States." [47] Thus emerging, said one of the Act's draftsmen,[48] was the underlying legislative policy "that matters largely of a local nature, even though interstate in character, should be handled locally and should receive the consideration of local men familiar with the local conditions in the communities involved." [49]

Having found the need for federal regulation to be related mainly to interstate transmission and wholesaling of electricity,[50] Congress mandated in Section 201(b) that the provisions of the Act directed toward public electric utilities "shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce but shall not apply to any other sale of electric energy." [51] And once again observing the basic legislative plan for a federal-state division of regulatory power, Congress conferred upon the Commission jurisdiction "over all facilities for such transmission or sale of electric energy," [52] but explicated several categories in which the Commission would be powerless to act.[53]

"The limitation on the Federal Power Commission's jurisdiction in this re-gard," reported the Senate Committee on Interstate Commerce, "has been inserted in each section in an effort to prevent the expansion of Federal authority over State matters." [54] And the restriction which particularly concerns us is found in the provision of Section 201(b) that the Commission "shall not have jurisdiction, except as specifically provided * * *, over facilities used * * * in local distribution * * * " [55]

The bill that became the Federal Power Act was drafted by the Commission.[56] The Senate and House bills that proceeded to final passage as the Act contained, in identically its present language, what is now the Section 203(a) "merge or consolidate" clause.[57] This is to say more than that the clause ran the legislative gamut from introduction to enactment without change of any sort. It is to suggest that its survival, in unmodified form, of scrutiny by both an agency and a legislature intent upon a division of regulatory authority between the national and state governments seriously inveighs against the likelihood that the question as to which was to control acquisitions of nonjurisdictional facilities was intended to be left open to either administrative or judicial speculation.

47. See note 45, *supra.*

48. See the text *infra* at note 58.

49. Hearings on H.R. 5423 at 393 (testimony of Commissioner Seavey).

50. See note 45, *supra.*

51. "The provisions of this Part shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part and the Part next following, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the trans-mission of electric energy consumed wholly by the transmitter." Federal Power Act § 201(b), 16 U.S.C. § 824(b).

52. *Ibid.*

53. *Ibid.*

54. S.Rep.No. 621, 74th Cong., 1st Sess. 18 (1935).

55. 16 U.S.C. § 824(b). The clause "except as specifically provided in this Part or in the Part next following" was inserted in conference. H.R.Rep.No. 1903, 74th Cong., 1st Sess. 74 (1935). The Conference Committee explained that the "clarifying clause [was] added to remove any doubt as to the Commission's jurisdiction over facilities used for the generation and local distirbution of electric energy to the extent provided in other sections of this Part and the Part next following." *Ibid.*

56. Hearings on S. 1725 at 223.

57. Hearings on S. 1725 at 40; Hearings on H.R. 5423 at 33.

The Commission committed the authorship of the bill to Commissioner Seavey and Solicitor DeVane,[58] and each testified in its support. Not only do we comb their statements in vain for any claim that the acquisition clause was intended to include nonjurisdictional facilities but, to the extent that they referred to it, each stated the contrary. Commissioner Seavey had occasion to briefly but unqualifiedly observe that "[f]acilities for local distribution * * * are excluded" from the Act.[59] Solicitor DeVane, who discussed Section 203(a) quite elaborately, explained that "it has nothing to do with facilities that relate only to local distribution * * * *"[60]

The committee reports likewise reflect the view that the "merge or consolidate" clause was confined to jurisdictional properties. The Senate Committee on Interstate Commerce stated that Section 203(a) "requires Commission approval of the sale, lease, or other disposition of *facilities subject to the act* and of the consolidation of *such* facilities."[61] It

added that the section "subjects to the requirement of Commission authorization any sale, lease, or other disposition of the *facilities* of a public utility *subject to the act*[62] and any merger or consolidation of *such* facilities."[63] The House Committee on Interstate and Foreign Commerce similarly reported that the proposed legislation "gives control over * * * the consolidation, purchase, and sale of *interstate operating properties*[64] and, specifically as to Section 203(a), that "approval must be secured for the sale, lease, or other disposition by a public utility of all of its *facilities subject to the jurisdiction of the Commission*, or any part of the facilities in excess of a value of $100,000,[65] and for mergers or consolidations of *such* facilities."[66]

From relevant legislative history, then, several far-reaching considerations emerge conspicuously. The congressional philosophy involved basically a definition of separate spheres for federal and state regulation. The lines of demarcation were carefully drawn, in terms of

---

58. Hearings on H.R. 5423 at 553.

59. *Id.* at 385.

60. "Now, * * * we go to the question of jurisdiction over facilities and over securities, and over acquisitions and sales of property.

"Those sections in the act may be considered together without dealing with them separately in detail.

"The Commission is given under section 202 and section 203 of the bill the duty of attempting to bring these systems into district and integrated systems, the purpose being to provide the best and cheapest service that can be provided for the public. If that is to be accomplished, and to my mind, that is the most important part of this bill, the provision that authorizes the Commission to compel interconnections between these systems, and make the power available where it is needed—I say if that is to be accomplished, then, this Commission must have certain jurisdiction over facilities and jurisdiction over acquisition of property, and jurisdiction over securities. * * *

"Insofar as the facilities are concerned, [the bill] takes no jurisdiction away from the States, but it does confer additional jurisdiction upon this Commission as to *those facilities that have to do with interstate transmission.*

"I want to make that distinction very clear, because *it has nothing to do with facilities that relate only to local distribution or to transmission lines used for local distribution.*" Hearings on H.R. 5423 at 501 (emphasis supplied), see also pp. 384, 548; Hearings on S. 1725 at 234, 246, 258–259.

61. S.Rep.No. 621, 74th Cong., 1st Sess. 20 (1935) (emphasis supplied.)

62. At the time of submission of the committee reports, the Senate version exempted from the disposition clause facilities not exceeding $25,000 in value, and the House version exempted from that clause facilities not in excess of a value of $100,000. S.Rep.No. 621, 74th Cong., 1st Sess. 50 (1935); H.R.Rep.No. 1318, 74th Cong., 1st Sess. 28 (1935). Reduction of the amount of the exemption to $50,000 was effected in conference. H.R. Rep.No. 1903, 74th Cong., 1st Sess. 74–75 (1935).

63. S.Rep.No. 621, 74th Cong., 1st Sess. 50 (1935) (emphasis supplied).

64. H.R.Rep.No. 1318, 74th Cong., 1st Sess. 8 (1935) (emphasis supplied).

65. See note 62, *supra.*

66. H.R.Rep.No. 1318, 74th Cong., 1st Sess. 28 (1935) (emphasis supplied).

operating facilities as well as operations, and the "merge or consolidate" clause was an integral part of that effort. From all that was said by those who authored it, as well as by the committees which nurtured it, it appears that the clause was intended to affect acquisitions of jurisdictional facilities only. We now look, for further evidence of legislative intention, to the statutory language itself.

## III

We may readily place in proper perspective the provision in Section 201 (a) that federal regulation, as there broadly projected, is "to extend only to those matters which are not subject to regulation by the States."[67] Born simply a statement of aims, and later reworded without any discernible purpose to substantively change its character,[68] it is not a limitation on the Commission's exercise of any authority Congress distinctly conferred upon it.[69] This provision is "merely a policy declaration * * * of great generality. It cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly expressed purpose."[70] So, "once a company is prop-erly found to be a 'public utility' under the Act the fact that a local commission may also have regulatory power does not preclude exercise of the Commission's functions."[71] The circumstance that South Carolina held sway over the Duke-Clemson transaction does not oust the Commission's jurisdiction over that transaction if Congress gave it any.

This is not, however, to say that the Section 201(a) policy declaration may play no part in the jurisdictional determination we must make in this case. The "declaration is relevant and entitled to respect as a guide in resolving any ambiguity or indefiniteness in the specific provisions which purport to carry out its intent. It cannot be wholly ignored."[72] For that purpose, and to that extent, we give it consideration as we ponder the problem before us.

Quite different in character, however, is the restriction incorporated in the provision of Section 201(b) that the Commission "shall not have jurisdiction, except as specifically provided, * * * over facilities used * * * in local distribution."[73] The Act, as we have seen, effectuated federal control over the transmission and the sale at wholesale of

67. See note 45, supra.

68. FPC v. Southern California Edison Co., supra note 20, 376 U.S. at 215–216, 84 S.Ct. 644, 11 L.Ed.2d 638; United States v. Public Utilities Comm'n, supra note 39, 345 U.S. at 310–314, 73 S.Ct. 706, 97 L.Ed. 1020; Connecticut Light & Power Co. v. FPC, supra note 20, 324 U.S. at 527–528, 84 S.Ct. 644; Jersey Central Power & Light Co. v. FPC, supra note 20, 319 U.S. at 74–78, 63 S.Ct. 953.

69. See the discussion in Jersey Central Power & Light Co. v. FPC, supra note 20, 319 U.S. at 76, 63 S.Ct. 953. See also United States v. Public Utilities Comm'n, supra note 39, 345 U.S. at 311, 73 S.Ct. 706, 97 L.Ed. 1020.

70. FPC v. Southern California Edison Co., supra note 20, 376 U.S. at 215, 84 S.Ct. 644, quoting Connecticut Light & Power Co. v. FPC, supra note 20, 324 U.S. at 527, 65 S.Ct. 749. See also United States v. Public Utilities Comm'n, supra note 39, 345 U.S. at 311, 73 S.Ct. 706, 97 L. Ed. 1020.

71. Connecticut Light & Power Co. v. FPC, supra note 20, 324 U.S. at 533, 65 S.Ct. 749. A contrary construction would, of course, nullify the succeeding sections of the Act which unambiguously authorize the Commission to deal with particular matters which are also subject to regulation by the states. Jersey Central Power & Light Co. v. FPC, supra note 20, 319 U.S. at 74–75, 63 S.Ct. 953, 87 L.Ed. 1258.

72. Connecticut Light & Power Co. v. FPC, supra note 20, 324 U.S. at 527, 65 S.Ct. 749, 755, 89 L.Ed. 1150. The question in that case was whether an electric company was a public utility within the meaning of the Act, rather than the question whether a particular provision of the Act has application to a company which in fact is such a public utility. We perceive no reason why the interpretive values of the declaration would be any less in the case of the one ambiguity than in the other. See note 78, infra.

73. See note 51, supra.

electric energy in interstate commerce,[74] and established the Commission's regulatory power over public utilities engaging in either of these pursuits.[75] And, as the framers of the Act envisioned, "[f]ederal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental, test."[76] But this test, if applied unlimitedly and exclusively, would obviously obliterate the federal-state allocations of regulatory power specified in the Act whenever, at any point between generation and consumption, the energy traversed a state boundary.[77] The Section 201(b) curtailments of Commission jurisdiction on the contingencies enumerated stand guard against any such consequence.[78] As the Supreme Court has stated:

"[W]hatever reason or combination of reasons led Congress to put the provision in the Act, we think it meant what it said by the words 'but shall not have jurisdiction, except as specifically provided in this Part or in the Part next following * * * over facilities used in local distribution.' Congress by these terms plainly was trying to reconcile the claims of federal and of local authorities and to apportion federal and state jurisdiction over the industry. To define the scope of state controls, Congress employed terms of limitation perhaps less scientific, less precise, less definite than the terms of the grant of federal power. The expression 'facilities used in local distribution' is one of relative generality. But as used in this Act it is not a meaningless generality in the light of our history and the structure of our government. We hold the phrase to be a limitation on jurisdiction and a legal standard that must be given effect in this case in addition to the technological transmission test."[79]

74. *Ibid.*

75. *Ibid.*

76. Connecticut Light & Power Co. v. FPC, *supra* note 20, 324 U.S. at 529, 65 S.Ct. 749, 755, 89 L.Ed. 1150. See also FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 209 n. 5, 84 S.Ct. 644, 11 L.Ed.2d 638.

77. "This bill came before Congress as prepared by the staff of the Commission, couched largely in the technical language of. the electric art. Federal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental, test. Technology of the business is such that if any part of a supply of electric energy comes from outside of a state it is, or may be, present in every connected distribution facility. Every facility from generator to the appliance for consumption may thus be called one for transmitting such interstate power. By this test the cord from a light plug to a toaster on the breakfast table is a facility for transmission of interstate energy if any part of the load is generated without the state. It has never been questioned that technologically generation, transmission, distribution and consumption are so fused and interdependent that the whole enterprise is within the reach of the commerce power of Congress, either on the basis that it is, or that it affects, interstate commerce, if at any point it crosses a state line. Such a broad and undivided base for jurisdiction of the Power Commission would be quite unobjectionable and perhaps highly salutary if the United States were a unitary government and the only conflicting interests to be considered were those of the regulated company." Connecticut Light & Power Co. v. FPC, *supra* note 20, 324 U.S. at 529–530, 65 S. Ct. 749, 755, 89 L.Ed. 1150.

78. "It is hard for us to believe that Congress meant us to read 'shall have jurisdiction' where it had carefully written 'but shall not have jurisdiction.' The command 'thou shalt not' is usually rendered as to forbid and we think here it was employed without subtlety or contortion and in its usual sense. If otherwise in doubt this provision should be read in harmony with the policy provision. So read, its terms seem plainly to state circumstances under which the Commission shall not have jurisdiction. As such it is the provision which loomed importantly in the minds and speech of its sponsors, perhaps was necessary to get the bill passed, and is one which the Commission must observe and the courts must enforce." Connecticut Light & Power Co. v. FPC, *supra* note 20, 324 U.S. at 528–529, 65 S.Ct. 749, 755, 89 L.Ed. 1150.

79. *Id.* at 530–531, 65 S.Ct. 749, 756. And we have no doubt but that, unless it is

Thus we derive two canons, each emanating from the Act, by which our construction of the "merge or consolidate" clause of Section 203(a) is to be guided. The Commission lacked jurisdiction over the local distribution facilities Duke acquired from Clemson unless that jurisdiction was "specifically" granted in Section 203(a) or elsewhere in the Act. And in resolving any ambiguity as to whether it was granted, we must remain sensitive to the policy declaration in Section 201 (a). With these, and other criteria appropriate to the solution of problems of statutory interpretation, we focus upon particular provisions and purposes of the Act.

## IV

"No public utility," said Congress, "shall * * * merge or consolidate such facilities * * * with those of any other person," [80] and both the Commission's decision under review [81] and its argument here endeavor to support its position that this clause embraces non-

jurisdictional facilities by concentrating on the use of the word "person." It is clear, and the Commission concedes, that the meaning of "such facilities" is crystallized by their grammatical antecedent, 'facilities subject to the jurisdiction of the Commission," [82] but the Commission disputes Duke's contention that the latter phrase also fixes the meaning of "those." Pointing to the fact that the Act gives "person" [83] a broader definition than "public utility," [84] the Commission insists that if "those" referred only to jurisdictional facilities, "person," as distinguished from "public utility," is inappropriately used, the theory being that the "person" would in every case be a "public utility" by reason of its ownership of such jurisdictional facilities. To give proper range to "person," the argument runs, it is necessary to extend it to every utility disposing of operating facilities, although only nonjurisdictional facilities, and to construe "those" as including such facilities.[85]

otherwise "specifically provided," the "shall not have jurisdiction" provision qualifies the applicability of the "merge or consolidate" clause where nonjurisdictional facilities are involved. The Commission argues contrarily that the clause directs a prohibition to a proposed acquisitional transaction by a "public utility," and that the transaction—its terms and conditions—and not the nature of the facilities, is the subject to which it is addressed. We think this begs the question, which is whether the clause, properly construed, affects the acquisitional transaction only because of the nature of the facilities acquired. In viewing the transaction between Duke and Clemson, we cannot distinguish between Duke's acquisitional activity and the facilities Duke thereby obtained. See FPC v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 504–505, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949). See also Connecticut Light & Power Co. v. FPC, supra note 20, 324 U.S. at 528, 84 S.Ct. 644, 11 L.Ed.2d 638. To say that regulation of an acquisition of facilities is not an exercise of jurisdiction over the facilities very plainly sacrifices substance to form. We presume that the Commission would not suggest that it has authority to regulate rates for retail sales by a public utility on the theory that it was thereby exercising ju-

risdiction over the public utility and not over the rates.

80. Federal Power Act § 203(a), 16 U.S.C. § 824b(a), quoted in part supra p. 5.

81. In re Duke Power Co., supra note 3, 36 F.P.C. at 399–405.

82. Id. at 401.

83. Federal Power Act § 3(4), 16 U.S.C. § 796(4). See also the text infra at note 92.

84. See Federal Power Act § 201(e), 16 U.S.C. § 824(e), quoted supra note 17.

85. Our question is not whether the facilities Duke bought from Clemson are "subject to the jurisdiction of the Commission" within the meaning of Section 201 (e), 16 U.S.C. § 824(e), so as to make their owner a "public utility" as such subject to the regulatory provisions of the Act. Duke's status as a public utility was not dependent upon those facilities. The issue is whether Section 203 (a), 16 U.S.C. § 824b(a), requires Duke, admittedly a public utility by reason of its ownership and operation of other jurisdictional facilities, to obtain Commission approval before consummating its purchase from Clemson. If it does, Section 201(b), 16 U.S.C. § 824(b), which defines jurisdictional facilities, makes it

We cannot accept the Commission's foundational premise that jurisdictional facilities can be acquired only from a company which is a "public utility" under the Act. Governmental agencies and instrumentalities,[86] utilities carrying on only intrastate business[87] and, as we recently held, electric cooperatives financed under the Rural Electrification Act,[88] are not "public utilities," but we have no doubt that any acquisition from either by a public utility of what would normally be a jurisdictional facility, such as a transmission line conducting interstate energy, would fall within the purview of the clause under consideration.[89] Thus, we disagree with the Commission that the use of "public utility" and "person" in Section 203(a) was an effort toward the contradistinction which it assumes, or that the use of "person" is pivotal in the construction of that clause.

We may, for guidance in this connection, draw upon a precedent which United States v. Public Utilities Commission[90] affords. The Act defines a "sale of electric energy at wholesale," when within the Commission's jurisdiction, as "a sale of electric energy to any person for resale."[91] At the same time, person is defined as meaning "an individual or a corporation,"[92] but municipalities are excluded from the definition of "corporation."[93] On this basis, it was argued

that sales of electric energy to a Nevada county had been put beyond the regulatory authority of the Commission. The Court disagreed, partly because an examination of legislative history led to the conclusion "that the Congress attached no significance of substance to the addition of the word 'person,' and in fact did not intend it as a limitation on Commission jurisdiction."[94]

We find a quite similar situation here. Solicitor DeVane, a draftsman of the Act[95] who emphasized that the "merge or consolidate" clause did not encompass local distribution facilities,[96] explained to the House Committee on Interstate and Foreign Commerce that "we also use the word 'person,' because in the drafting of the act, and particularly in the new part of the act, you could use the word 'person' with brevity and it made simplification for drafting."[97] The Senate and House committee reports ascribe no importance to the word "person" in that clause and indicate plainly that it related only to jurisdictional facilities.[98] Nowhere in the Act's legislative history do we find a suggestion that the word is to be given the connotation urged by the Commission.[99]

We think, too, that a construction limiting the operation of the acquisition clause to jurisdictional facilities more nearly comports with its remaining lan-

plain that the Commission's regulatory authority is not limited to transactions and activities involving only jurisdictional facilities where it is otherwise "specifically provided" in the Act.

86. Federal Power Act § 201(f), 16 U.S.C. § 824(f).

87. Connecticut Light & Power Co. v. FPC, *supra* note 20.

88. Salt River Agricultural Improvement & Power Dist. v. FPC, 129 U.S.App.D.C. 117, 391 F.2d 470 (1968).

89. Compare United States v. Public Utilities Comm'n, *supra* note 39, 345 U.S. at 316–318, 73 S.Ct. 706, 97 L.Ed. 1020.

90. *Supra* note 39, 345 U.S. at 312–316, 73 S.Ct. 706, 97 L.Ed. 1020.

91. Federal Power Act § 201(d), 16 U.S.C. § 824(d).

92. Federal Power Act § 3(4), 16 U.S.C. § 796(4).

93. Federal Power Act § 3(3), 16 U.S.C. § 796(3).

94. 345 U.S. at 313, 73 S.Ct. at 706. Other factors were lack of support for the suggested construction "in the statutory scheme as a whole" (at 312–13), and administrative and judicial construction to the contrary (at 314–15).

95. See note 58, *supra*, and accompanying text.

96. See note 60, *supra*.

97. Hearings on H.R. 5423 at 460.

98. See the text *supra* at notes 61–66.

99. See 79 Cong.Rec. 10378 (1935) (remarks of Representative Lea).

guage. The prohibition the clause effects can be violated only if one undertakes to "merge or consolidate" facilities intercepted by the word "those" with "such facilities," and "such facilities," we have said and the parties have agreed, must be jurisdictional facilities which, in turn, are facilities engaged in the transmission or sale at wholesale of electric energy in interstate commerce. The integration of acquired jurisdictional facilities and the acquirer's pre-existing jurisdictional facilities strikes us as the very kind of union Congress intended to bring under Commission control. But it is quite a strain to consider an acquisition and unaltered use of a local distribution system as a "merger" or "consolidation" with the jurisdictional facilities which make possible the acquirer's interstate operations.

■ Adverting briefly to a taproot, we are taken back once again to the explicit provision that the Commission "shall not have jurisdiction, except as specifically provided * * * over facilities used * * * in local distribution." [100] The Commission's construction is palatable only if it can be said that by its choice of "person," Congress "specifically provided" for jurisdiction over acquisitions of local distribution facilities.[101] We are not persuaded that the unsophisticated use of "person" in the "merge or consolidate" clause was so precise a formulation of Commission authority over local distribution systems as to warrant that conclusion.

V

The Commission also directs our attention to the effect which an acquisition

of facilities might possibly have upon the caliber of the service the acquiring utility can furnish, and upon the degree of coordination, both internally and externally, of its operating facilities it can achieve.[102] It is pointed out that a prime purpose of the Federal Power Act in general and Section 203(a) in particular was "to protect the public against an uneconomic realinement" of utility companies expected to occur in the wake of the "unscrambling of the holding company properties" as a result of the Public Utility Holding Company Act of 1935.[103] And the Commission argues that the linguistic vagaries of Section 203(a) should be interpreted broadly to effectuate this purpose.[104]

We acknowledge the general purpose thus stated as one of the underpinnings of the Power Act, but we cannot derive from it, in combination with the imprecise language of Section 203(a), a specific jurisdictional grant. On the contrary, in context, the manner in which the Act treated the problem of efficient realinement generally leads us to the conclusion that it was intended to exclude nonjurisdictional facilities from its coverage.

The Commission's power with reference to a public utility's service, we have said,[105] is confined by the general jurisdictional grant to the utility's interstate operations. The Act more specially provides that the Commission, only "upon complaint of a State commission" and within fixed limitations, may correct inadequacies in the utility's "interstate service." [106] From this we would suppose

---

100. Federal Power Act § 201(b), 16 U.S.C. § 824(b), discussed *supra* pp. 17 to 19.

101. See the text *supra* at notes 73 to 79.

102. See also In re Duke Power Co., *supra* note 3, 36 F.P.C. at 404.

103. Hearings on H. R. 5423, at 560 (testimony of Solicitor DeVane). Echoing this concern is S.Rep.No. 621, 74th Cong., 1st Sess. 50 (1935).

104. *Cf.* United Gas Improvement Co. v. Continental Oil Co., 381 U.S. 392, 400–401, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965).

105. See the text *supra* at notes 50 to 55.

106. "Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate

that the Commission's legitimate concern as to the relationship between the utility's service and its operating properties would be restricted to jurisdictional facilities, by which the interstate service is provided. And this we find, from other provisions of the Act, the case very definitely to be.

External coordination and interconnection of facilities are subjects to which the elaborate provisions of Section 202 [107] are addressed. Subsection (a) directs the Commission, for purposes related to the maximum availability of electric service, "to divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy," [108] and provides that "[i]t shall be the duty of the Commission to *promote* and *encourage* such interconnection and coordination within each such district and between such districts." [109] We find nothing in this language authorizing the Commission to *compel* any particular interconnection or technique of coordination.[110] Subsection

service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers." Federal Power Act § 207, 16 U.S.C. § 824f.

S. 2796, as passed by the Senate, would have *empowered the Commission, either upon complaint or on its own motion, to* determine and fix the service, equipment and facilities to be maintained by a utility whenever the Commission should find that they had not been properly maintained. See S.Rep.No. 621, 74th Cong., 1st Sess. 52 (1935). Modifications by the House reduced its authority to the point specified in Section 207. H.R.Rep. No. 1318, 74th Cong., 1st Sess. 29 (1935).

107. 16 U.S.C. § 824a.

108. "For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnected and coordinated electric facilities. It shall be the duty of the Commission to *promote* and *encourage*

such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State Commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations." Federal Power Act § 202(a), 16 U.S.C. § 824a(a) (emphasis supplied).

109. *Ibid.* (emphasis supplied).

110. In reporting S. 2796, the Senate Committee on Interstate Commerce stated:
"Section 202(a) of S. 1725 [the original Senate bill] imposed upon each public utility the duty to furnish energy to, exchange energy with and transmit energy for any person upon reasonable request. This provision has been eliminated, and the other subsections of the old section 202 which relate to rates have been removed to the general rate sections (sec. 205). While imposition of these duties may ultimately be found to be desirable, the committee does not think that they should be included in this first exercise of Federal power over electric companies. It relies upon the provision for the voluntary coordination of electric facilities in regional districts contained in the new section 202(a) (formerly sec. 203(a)), for the first Federal effort in this direction. * * * Furthermore, the provisions of the old section 203(b) empowering the Federal Power Commission to require one utility to permit the use of its facilities by another * * * have been eliminated; these matters are left to the voluntary action of the utilities." S.Rep. No. 621, 74th Cong., 1st Sess. 19 (1935).
The House Committee on Interstate and Foreign Commerce, in reporting H.R.

(b) empowers the Commission, "upon application of any State commission or of any person engaged in the transmission or sale of electric energy" and subject to stated conditions, to "direct a public utility * * * to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such per-sons." [111] These provisions, while licensing the Commission to require a public utility to interconnect in the circumstances specified, do not touch the matter of its acquisition of operating properties.[112] The same observation is pertinent to subsections (c) and (d), which relate exclusively to temporary interconnections during national emergencies.[113]

5423, similarly emphasized the voluntary character of the coordination of facilities:

"This section authorizes the Commission to establish regional districts and to encourage the voluntary interconnection and coordination of facilities within and between such districts, but the coordination of facilities is left to the voluntary action of the utilities." H.R.Rep. No. 1318, 74th Cong., 1st Sess. 27 (1935).

H.R. 5423, in this respect, restated in modified language the similar provisions in S. 2796. The House version, with minor amendments, was adopted in conference. H.R.Rep.No. 1903, 74th Cong., 1st Sess. 74 (1935).

111. "Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them." Federal Power Act § 202(b), 16 U.S.C. § 824a (b).

112. The Senate bill limited the Commission's power to require interconnections to situations where both parties were interstate utilities. See S.Rep. No. 621, 74th Cong., 1st Sess. 19 (1935). The House Committee on Interstate and Foreign Commerce "saw no reason for denying the same privilege to a company engaged in intrastate commerce where it desired the benefits of the interconnection." H.R.Rep.No. 1318, 74th Cong., 1st Sess. 28 (1935). The House version, giving the Commission limited authority to require the interconnection in that event, ultimately prevailed.

113. "During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party." Federal Power Act § 202(c), 16 U.S.C. § 824a(c).

"During the continuance of any emergency requiring immediate action, any person engaged in the transmission or sale of electric energy and not otherwise subject to the jurisdiction of the Commission may make such temporary connections with any public utility subject to the jurisdiction of the Commission or may construct such temporary facili-

Also reflecting the concern for economic alinement of electric facilities in the wake of the Holding Company Act was that portion of Section 203(a) which provides that "[n]o public utility shall * * * purchase, acquire, or take any security of any other public utility" without Commission approval.[114] This provision complements the "merge or consolidate" clause by assuring that unapproved combinations which cannot be created directly by the purchase of assets also cannot be created indirectly by the purchase of securities, and both are designed to complement the Holding Company Act. But significantly, the Section 203(a) restrictions on stock purchases are specifically limited to purchases *by* public utilities—jurisdictional companies —*of* public utility stock.[115]

Subsection (a) of Section 203, of which the "merge or consolidate" clause is a part, specifies the procedural steps preliminary to Commission action upon an application for approval of either of the three activities to which that subsection applies,[116] and requires the Commission to approve the activity if it is "consistent with the public interest." [117] Subsection (b) authorizes the Commission, upon granting such approval, to impose "such terms and conditions as it finds necessary or appropriate to secure the maintenance of adequate service and the coordination in the public interest of *facilities subject to the jurisdiction of the Commission.*" [118] It is evident from this provision that as to the quality of the utility's service and the internal coordination of its operating properties, Congress intended to forge the link with jurisdictional facilities only.[119]

This conclusion seems inevitable, not only from the language of the Act, but from logic as well. Acquisitions by pub-

ties for the transmission of electric energy in interstate commerce as may be necessary or appropriate to meet such emergency, and shall not become subject to the jurisdiction of the Commission by reason of such temporary connection or temporary construction: *Provided,* That such temporary connection shall be discontinued or such temporary construction removed or otherwise disposed of upon the termination of such emergency: *Provided further,* That upon approval of the Commission permanent connections for emergency use only may be made hereunder." Federal Power Act § 202(d), 16 U.S.C. § 824a(d).

114. See S.Rep. No. 621, 74th Cong., 1st Sess. 50 (1935): "The Commission is authorized to deny its authorization in cases where the proposed acquisition would impede * * * the coordination of facilities under the act. * * *"

115. The Commission, somewhat ingeniously, argues that a purchase of non-public utility stock, by clear implication outside of the province of the Act, would be prohibited under its sweeping interpretation of the "merge or consolidate" clause. Although it is possible that, under the broad reading put to us, such a peculiar result might follow, we do not believe that the vague language of the "merge or consolidate" clause was intended to swallow up the clear import of the limited proscriptions against purchasing securities.

116. *Supra* p. 6.

117. 16 U.S.C. § 824b(a).

118. "The Commission may grant any application for an order under this section in whole or in part and upon such terms and conditions as it finds necessary or appropriate to secure the maintenance of adequate service and the coordination in the public interest of *facilities subject to the jurisdiction of the Commission.* The Commission may from time to time for good cause shown make such orders supplemental to any order made under this section as it may find necessary or appropriate." Federal Power Act § 203(b), 16 U.S.C. § 824b(b) (emphasis supplied).

119. We are fortified in this conclusion by certain differences between S. 1725, the bill as originally drafted and introduced, and S. 2796, the substitute bill which emerged from committee. As we have indicated, text *supra* at note 57, Section 203(a), in relevant portion, was carried over unchanged from the earlier proposal, but in that earlier draft a section (§ 204) provided that no public utility shall *construct, extend, or acquire* facilities subject to the jurisdiction of the Commission without a certificate of convenience and necessity. During the hearings before the House Committee on Interstate and Foreign Commerce, the latter section was attacked as too broad.

lic utilities, it seems to us, have no greater influence upon service and coordination of facilities than dispositions, as to which the utilities enjoy a large measure of immunity from Commission control. Only dispositions of "facilities subject to the jurisdiction of the Commission" may be regulated by the Commission,[120] and not even those when they do not exceed $50,000 in value.[121] The anomalousness of the Commission's argument becomes the more apparent in light of the fact that jurisdictional facilities constitute but a small portion of the industry's investment in total electric utility plant.[122] It is hard to believe that while Congress left Duke completely free to dispose of its vast holdings in non-jurisdictional properties, it intended to condition its purchase from Clemson of a small distribution plant upon the Commission's prior sanction.

The Commission, both in its opinion and in argument to us, relies on language from the report of the Senate Committee on Interstate Commerce as demonstrating congressional disapproval of unregulated over-concentration in the power industry.[123] The cited language, however, relates to Title I and not Title II of the statute. Title I, the Holding Company Act, gave the Securities and Exchange Commission sweeping power to deal comprehensively with the whole problem of acquisitions affecting the structure of the power industry. With significant exceptions, SEC approval was required before any holding company or subsidiary could lawfully "acquire, directly or indirectly, any securities or utility assets or any other interest in any business." [124] And SEC approval was to be given only if the Commission was satisfied that explicitly enumerated public interest standards had been met.[125] Yet even Title I of the 1935 legislation—where one would expect to find far-reaching concern for acquisitions most strongly manifested—did not require federal approval of an acquisition when, as

---

Solicitor DeVane was challenged to deny that such a provision would require Commission approval prior to the purchase of "a new shovel to throw coal under a boiler." Unable to deny that the language would include such a transaction (although denying that such was the intent of the drafters), Solicitor DeVane invited the Committee to amend the section. The apparent result was the abandonment of the section altogether. See Hearings on H.R. 5423 at 2151–53. See also S.Rep. No. 621, 74th Cong., 1st Sess. 20 (1935).

120. Federal Power Act § 203(a), 16 U.S.C. § 824b(a). The Commission suggests that a disposition of facilities by one "public utility" to another "public utility" can be regulated as an acquisition by the latter public utility. This is true only if the subject of the disposition is a jurisdictional facility or, of course, if Section 203(a) is construed to embrace acquisitions of nonjurisdictional facilities. In any event, it is certain that dispositions of nonjurisdictional facilities to non-public utilities are beyond the Commission's authority.

121. Federal Power Act § 201(a), 16 U.S.C. § 824b(a), quoted in part *supra* p. 5.

122. A utility's jurisdictional facilities are very predominantly, although not entirely, transmission facilities. At the end of 1966, the total investment in transmission facilities, jurisdictional and nonjurisdictional, was about $10 billion out of the industry's investment in total electric utility plant of approximately $64 billion. Federal Power Commission, Statistics of Privately Owned Electric Utilities in the United States 1966 (1967).

123. That portion of the report relied upon by respondent reads: "The [Securities and Exchange] commission should have complete control over the acquisition of new securities and properties by holding companies and others in holding-company systems in the course of reorganizations and rearrangements of properties. New acquisitions should not be allowed unless the applicant can clearly demonstrate a resultant economy and efficiency from the connection of naturally related and interdependent properties. The commission [SEC] should have power to prevent acquisitions at prices which do not bear a proper relation to the capital prudently invested in the underlying utility properties, or if the acquisition would tend to create monopoly or restraint of trade in the exercise of control of public-utility companies." S.Rep. No. 621, 74th Cong., 1st Sess. 59 (1935).

124. 15 U.S.C. § 79i.

125. 15 U.S.C. § 79j.

here,[126] the state authority expressly authorized it.

We recognize, as the Commission asserts, that the increased load which the acquiring utility might be required to serve in consequence of an addition of nonjurisdictional facilities could conceivably depreciate the service it affords through its jurisdictional facilities. We also realize that an improvident purchase of nonjurisdictional facilities might to some extent hamper the optimum synchronization of its jurisdictional facilities. But to conclude from these possibilities that Section 203(a) is a broad jurisdictional grant is inconsistent with the pattern of the statute. A fair reading of the legislative history, in our view, fails to establish a careful, deliberate attempt to coordinate Titles I and II. Rather, these provisions were separately and independently authored to be enforced by different agencies, and it is our clear impression that close attention was never given to their harmonious functioning. Against this backdrop, what stands out and prevails in our view is the premise of the Power Act capsuled in the policy statement of Section 201.

## VI

A mainstay in the Commission's argument for an interpretation of the "merge or consolidate" clause which would cover purchases of nonjurisdictional facilities is the Commission's assertion of need for ways and means to prevent public utilities from inflating their property accounts through write-ups on new acquisitions.[127] We do not gainsay the importance of tools adequate to forestall accounting abuses which ultimately and unfairly create higher charges for electricity, nor do we overlook the practical values which Commission control over all property augmentations could create. Other provisions of the Act, however, arm the Commission with formidable weapons with which to eradicate fictitious write-ups, and these, we think, serve to further militate against the adoption of the expanded construction of the acquisition clause which is urged upon us.

The Commission is statutorily empowered to investigate and ascertain the legitimate costs of public utility properties, the rates of depreciation thereon, and such other facts as a determination of fair value for ratemaking purposes might involve.[128] To this end, the utilities are required to inventory their properties with the Commission,[129] to maintain their financial records conformably with the Commission's uniform accounting system,[130] and to supply the Commission with essential information.[131] By exercise of its broad power to order appropriate accounting adjustments,[132] the Commission can require any excess in purchase price over net original cost of an acquired property to be disposed of [133] and any artificial write-up in

126. 15 U.S.C. § 79i(b) (1). *Cf.* Federal Power Act § 204(f), 16 U.S.C. § 824c(f), which also exempts from FPC approval, out of deference to the states, security issues approved by a state commission.

127. See also In re Duke Power Co., *supra* note 3, 36 F.P.C. at 401–02.

128. Federal Power Act § 208(a), 16 U.S.C. § 824g(a).

129. Federal Power Act § 208(b), 16 U.S.C. § 824g(b).

130. Federal Power Act § 301, 16 U.S.C. § 825.

131. Federal Power Act §§ 301(b), 304(a), 16 U.S.C. §§ 825(b), 825c(a).

132. Federal Power Act § 301(a), 16 U.S.C. § 825(a). This section further provides that "[t]he burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof." See also Arkansas Power & Light Co. v. FPC, 87 U.S.App.D.C. 385, 386, 185 F.2d 751, 752 (1950), cert. denied 341 U.S. 909, 71 S.Ct. 621, 95 L.Ed. 1346 (1951); Alabama Power Co. v. FPC, 75 U.S.App.D.C. 315, 320–321, 128 F.2d 280, 285–286, cert. denied 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 525 (1942).

133. See, *e. g.*, California Oregon Power Co. v. FPC, 150 F.2d 25 (9th Cir. 1945), cert. denied 326 U.S. 781, 66 S.Ct. 336, 90 L.Ed. 473 (1946).

capital accounts to be eliminated.[134] As the Commission's experience in utilizing these provisions so vividly attests,[135] they provide the wherewithal for keeping problems of this sort under control.

The relationship these provisions bear to our constructional problem is well illustrated by Pennsylvania Electric Company v. FPC,[136] where they were held to substitute adequately for the expanded interpretation the Commission would have us adopt. A public utility, without the Commission's prior approval, bought three local distribution systems, and the Commission, asserting jurisdiction over the acquisition and finding that an inflated price had been paid, ordered an accounting adjustment to exclude the excess from the rate base.[137] Since this enabled complete rectification, the Third Circuit, on review, considered it unnecessary to decide whether the acquisition clause of Section 203(a) extended the Commission's jurisdiction to the purchase in question.

The Commission argues that since the accounting provisions authorize action only after an acquisition has occurred, situations could arise wherein they might not suffice to enable suitable modification of transactions out of harmony with the Act.[138] We suppose this is within the realm of possibility, but if there has ac-

tually been an occurrence of this sort, it has not been brought to our attention, and certainly none is claimed as to Duke.[139] Moreover, a similar problem of waste, with its ultimate adverse impact on the rate base, would arise in a variety of situations to which the Commission's jurisdiction does not extend. For example, a public utility may decide to sell at market value assets with low book value (but high economic value) and to use the funds to construct facilities of high book value. This may make good sense from the point of view of the utility's management, yet be improvident so far as the consumer is concerned, since there could be an increase in cost of utility service based on book value rate base that goes beyond the true value to the consumer of the substitution of facilities. Yet for distribution plant and other nonjurisdictional facilities, and these preponderate by far over the jurisdictional transmission lines, there is no requirement of advance Commission approval of disposition.

The point is that Congress did not pass a comprehensive regulatory measure giving the Commission regulatory jurisdiction broad enough to cover any and all possible evils. It may well be that Congress should plug all such possibilities.[140] We say only that it has not yet done so.

134. See, e. g., Northwestern Electric Co. v. FPC, 321 U.S. 119, 64 S.Ct. 451, 88 L.Ed. 596 (1944).

135. Since electric utilities came under the regulatory jurisdiction of the Commission, it has eliminated over $1.6 billion of excesses over original costs in a total of approximately $8.4 billion of previously recorded "utility plant" on their books. Federal Power Commission, Annual Report, 1965, at 96 (1965).

136. 188 F.2d 763 (3rd Cir. 1951.)

137. In re Pennsylvania Elec. Co., 9 F.P.C. 91 (1950).

138. The Commission argues hypothetically that an improperly inflated price can be carried by the utility's stockholders rather than by its consumers for a short period of time, but that a continuous drain on its current assets which such an allocation

might create would eventually affect the rate base, and would then be borne by the public. This echoes the view expressed by Commissioner Landis in his dissenting opinion in Western Airlines v. United Airlines, 8 C.A.B. 298, 340 (1947), that unsound investments can not be hidden forever as a "manipulation of accounts cannot cure the fact that a dissipation of assets has taken place."

139. As the Commission pointed out, In re Duke Power Company, supra note 3, 36 F.P.C. at 400, it was not undertaking in the proceeding before it to determine the correctness of Duke's allocation of the purchase price it paid to Clemson.

140. Compare Panhandle Eastern Pipe Line v. Public Utilities Comm'n, 332 U.S. 507, 522, 68 S.Ct. 190, 92 L.Ed. 128 (1947).

## VII

Much more fundamentally, the Commission's construction of the "merge or consolidate" clause as permitting an exercise of control over a public utility's purchase of nonjurisdictional facilities, because of an incidental effect it might have upon some aspect of the utility's interstate operations, would frustrate two major premises of the Act. Foremost is the deep-seated congressional policy by which regulatory authority in the public electric utility field was apportioned, in accordance with a precise formula, between the Commission and its counterparts in the states.[141] To accept the Commission's theory would emasculate the restrictions Congress imposed upon the exercise of its power and expand it "to the constitutional limit of congressional authority over commerce." [142]

The Commission's concept would also require, in order to decide whether jurisdiction over any particular acquisition exists, that the impact of local supervision be measured on a case-by-case basis. This "flexible approach" [143]—involving as it does the consideration, *inter alia,* of "the effect of the regulation upon the national interest in the commerce" [144]

—has been flatly rejected as a technique for resolving jurisdictional conflicts between the Commission and state bodies.[145] Congress might have adopted that approach, leaving its specific application to the courts, but instead it "undertook to regulate * * * without the necessity, where Congress has not acted, of drawing the precise line between state and federal power by the litigation of particular cases." [146] We think that like the line "[i]t cut sharply and cleanly between sales for resale and direct sales for consumptive uses" [147] to facilitate jurisdictional determinations in rate regulation, "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction, making unnecessary such case-by-case analysis," [148] in distributing regulatory power over the acquisition of facilities.[149]

The primary grant of Commission authority is expressed congruently with the specification of national power which Congress saw fit to delimit in the Act.[150] Thus "only the facilities of a public utility used in the transmission or sale at wholesale of electric energy in interstate commerce or the rates and charges for such energy are subjected * * * to regulation by the Federal Power Com-

141. *Supra* pp. 1600–02.

142. FPC v. Panhandle Eastern Pipe Line Co., *supra* note 79, 337 U.S. at 508, 69 S.Ct. at 1258.

143. FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 214, 84 S.Ct. 644, 11 L.Ed.2d 638.

144. *Id.* at 214, 84 S.Ct. 644, 650, quoting Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co., 314 U.S. 498, 505, 62 S.Ct. 384, 86 L.Ed. 371 (1942).

145. FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 213–216, 84 S.Ct. 644, 11 L.Ed.2d 638.

146. *Id.* at 214, 84 S.Ct. at 650, quoting ing Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co., *supra* note 144, 314 U.S. at 507, 62 S.Ct. 384, 86 L.Ed. 371.

147. FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 214, 84 S.Ct. 644, 651, quoting Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n,

*supra* note 140, 332 U.S. at 517, 68 S.Ct. 190, 92 L.Ed. 128.

148. FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 215–216, 84 S.Ct. at 651, 11 L.Ed.2d 638.

149. Compare Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co., *supra* note 144, which, discarding the "flexible approach," held that in view of § 1(b) of the Natural Gas Act, 15 U.S.C. § 717 (b), which legislation, like the Federal Power Act, "apportioned regulatory power between state and federal governments according to a test which [the Supreme] Court had developed in a series of cases under the Commerce Clause," FPC v. Southern California Edison Co., *supra* note 20, 376 U.S. at 211, 84 S.Ct. at 649 a state regulatory commission could not compel a utility selling interstate gas at wholesale to distributors for resale in a single state to extend its facilities for connection with those of a local distributor.

150. *Supra* p. 1602.

mission." [151] The Commission lacks jurisdiction over Duke's sales at retail in South Carolina [152] and, unless otherwise "specifically provided," [153] over Clemson's former local distribution system from which such sales are now made.

Various sections of the Act, including those to which the Commission refers, reflect congressional recognition of a relationship between property acquisitions and those aspects of the industry which it subjected to Commission control. They do not, however, imply—much less "specifically" provide for—a projection of power to intercept facilities which the Act's language and legislative background so clearly put beyond the Commission's reach.[154]

In sum, Congress nowhere "specifically provided" for Commission jurisdiction over an acquisition by a public utility of facilities utilized solely in local distribution of electric energy for retail sale. We do not find the provision of that jurisdiction either in the "merge or consolidate" clause or in any other portion of the Act.[155] We cannot impute to the Congress which so earnestly strove for precision and clarity in the formulation of its grant of federal authority an intention to confer the broad power the Commission assumed in this case.

### VIII

We have remained advertent to the fact that the decision under review is an interpretation of the Act by the agency to which its administration is entrusted.[156] Moreover, both protagonists solicited our examination of the Commission's past decisions construing the "merge or consolidate" clause in its relation to acquisitions of nonjurisdictional properties, and this we have carefully done. We customarily attach weight to the administrative construction of an authorizing statute,[157] and a consistent and clear-cut interpretation of the acquisition clause by the Commission might well have benefited this litigation. But we have derived little assistance from the vacillating policy the Commission has pursued over the years.

We found nothing of help one way or the other in the Commission's earliest adjudications, which for lack of finding or recital as to the character of the acquired facilities all too frequently left the decisional basis obscure.[158] In 1940, however, the Commission clearly and squarely held that an acquisition of nonjurisdictional distributive facilities did not require the Commission's prior approval. Faced with a situation where "the electric facilities proposed to be sold and purchased consist principally of a seven-mile wood pole electric line and appurtenances, and are facilities used only for the sale of electric energy at retail in serving approximately 145 customers in a small rural or predominantly rural area," the Commission held that these were "facilities used only in local distribution, which are not subject to the requirements of Section 203 of the Fed-

151. Jersey Central Power & Light Co. v. FPC, *supra* note 20, 319 U.S. at 73, 63 S.Ct. 953.

152. See Federal Power Act § 201(d), 16 U.S.C. § 824(d).

153. *Supra* p. 1606.

154. Compare FPC v. Panhandle Eastern Pipe Line Co., *supra* note 79, 337 U.S. at 505–509, 65 S.Ct. 749.

155. See also the discussion, *supra* pp. 17–19.

156. Compare Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968); Social Security Bd. v.

Nierotko, 327 U.S. 358, 368–369, 66 S.Ct. 637, 90 L.Ed. 718 (1946).

157. See Boesche v. Udall, 112 U.S.App. D.C. 344, 303 F.2d 204 (1961), aff'd 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); Wright v. Paine, 110 U.S.App. D.C. 100, 102, 289 F.2d 766, 768 (1961); Plains Television Corp. v. FCC, 108 U.S.App.D.C. 20, 24, 278 F.2d 854, 858 (1960).

158. See, *e. g.*, In re Florida Power Corp., 1 F.P.C. 650 (1935); In re Portland General Elec. Co., 1 F.P.C. 709 (1938); In re Connecticut River Power Co., 2 F.P.C. 539 (1939).

eral Power Act."[159] Shortly thereafter, it reached the same result in two additional cases where the properties sought were local distribution systems.[160] It is noteworthy that throughout this period Commissioner Seavey, who participated in the drafting of the Act, remained as a member of the Commission.[161]

Between 1944 and 1962, however, the Commission no less than five times shifted its position as to the applicability of the "merge or consolidate" clause to acquisitions of nonjurisdictional facilities.[162] It is evident that for many years the problem has vexed the Commission, as for some time it has troubled us, and we cannot rid ourselves of lingering doubts as to whether its interpretative conclusion is yet firm. In any event, it is apparent that its construction of the clause in this case cannot command the respect we might otherwise be inclined to pay to it. "The court is not bound by an administrative construction, and if that construction is not uniform and consistent, it will be taken into account only to the extent that it is supported by valid reasons."[163] We are convinced that the considerations the Commission advanced at the administrative level, and reiterated here, cannot survive that test.[164]

We reverse the order of the Commission under review and remand the case to the Commission for the entry of an order declaratory of the inapplicability of Section 203 of the Act to Duke's acqusition from Clemson.

Reversed and remanded.

159. In re Maryland Public Serv. Co., 2 F.P.C. 700, 701 (1940).

160. In re Portland General Elec. Co., 2 F.P.C. 1020 (1941); In re Associated Maryland Elec. Power Corp., 3 F.P.C. 646 (1942).

161. Administrative interpretations of statutes are entitled to peculiar weight where they involve "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Co. v. United States, *supra* note 29, 288 U.S. at 315, 53 S.Ct. at 358, 77 L.Ed. 796. See also Udall v. Tallman, 380 U.S. 1, 11, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Power Reactor Co. v. Electricians Union, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed. 2d 924 (1961); United States v. American Trucking Ass'n, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1949); Fawcus Mfg. Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397 (1931).

162. For a short period commencing in 1944 the Commission exercised jurisdiction over the acquisition of facilities employed in local distribution. See, *e. g.*, In re Southwestern Public Serv. Co., 4 F.P.C. 1123 (1945); In re Northern Virginia Power Co., 5 F.P.C. 458 (1946); In re Pennsylvania Power & Light Co., 6 F.P.C. 1114 (1947). But in 1947, it reached a diametrically contrary conclusion, In re Northern States Power Co., 6 F.P.C. 743 (1947), only to be followed soon thereafter by another change in construction. See, *e. g.*, In re Louisiana Power & Light Co., 12 F.P.C. 1168 (1953); In re Interstate Power Co., 16 F.P.C. 825 (1956). In 1950, the Commission rendered a comprehensive opinion treating the subject, and on grounds quite similar to those advanced here, concluded that such acquisitions fell within the purview of its authority. In re Pennsylvania Elec. Co., *supra* note 137, aff'd on other grounds, sub nom. Pennsylvania Elec. Co. v. FPC, *supra* note 136, 188 F.2d 763. To this interpretation the Commission adhered for the next five years, but during the next six-year interval it held that such acquisitions did not need its approval. In re Arizona Public Serv. Co., 15 F.P.C. 1120 (1956). In 1962, it again shifted ground and held that they did. In re Southern California Edison Co., 28 F.P.C. 787 (1962).

163. Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1931). See also Federal Maritime Bd. v. Isbrandtsen Co., 356 U.S. 481, 499–500, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958); United States v. Missouri Pac. R. R., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322 (1929).

164. Compare FPC v. Panhandle Eastern Pipe Line Co., *supra* note 79, 337 U.S. at 513–514, 69 S.Ct. 1251, 93 L.Ed. 1499.